**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.

DENVER BIBLE CHURCH;
PASTOR ROBERT A. ENYART;
COMMUNITY BAPTIST CHURCH;
PASTOR JOEY RHOADS

        Plaintiffs

v.

ALEX M. AZAR II, in his official capacity as Secretary,
United States Department of Health and Human Services;
Department of Health and Human Services;
CHAD F.WOLF, in his official capacity as Acting Secretary,
United States Department of Homeland Security;
Department of Homeland Security;
STEVEN T. MNUCHIN, in his official capacity as Secretary
United States Department of the Treasury;
Department of the Treasury;
JARED POLIS, in his official capacity as
Governor, State of Colorado, and
JILL HUNSAKER RYAN, in her official
capacity as Executive Director of, and together with, the
Colorado Department of Health and
Environment

        Defendants

---

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

---

        Plaintiffs, for their Complaint against Defendants in their official capacities and as listed

agencies, allege and state:

**PRELIMINARY ALLEGATIONS**

        The Federal and State Defendants, acting together, have violated Plaintiffs' First

Amendment rights without due process of law, affording Plaintiffs standing to bring claims

1

against the  agency defendants and individuals in their official capacities under 5 U.S.C. §702[1]

and 42 U.S.C. §1983,[2] as applicable, for declaratory and injunctive relief. The Federal

Defendants implemented federal law under the CARES Act[3] and the Stafford Act[4] in violation of

both the Religious Freedom Restoration Act ("RFRA")[5] and non-discrimination provisions of the

Stafford Act[6] and accompanying regulations.[7] Said violations took place by approving the

conditions of mitigation for allocation of federal resources to Governor Polis, in his official

capacity, in spite of the State Defendants' admitted discrimination against Plaintiffs, alleged here

to be in the form of executive and public health orders issued *ultra vires*. The Federal Defendants

lacked lawful grounds under RFRA to violate Plaintiffs' First Amendment rights because the

State Defendants lacked appropriate legal authority under state statutes and the Colorado

Constitution to deprive Plaintiffs under 42 U.S.C. §1983 of their religious liberty, all as set forth

more fully, *infra*. Federal Defendants' made approvals that are final agency actions for purposes

of judicial review of Plaintiffs' claims.

---

[1] The statute provides: "An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States." *See Perry Capital LLC v. Mnuchin*, 864 F.3d 591 (D.C. Cir. 2017)

[2] The statute provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia."

[3] Coronavirus Aid, Relief and Economic Security Act, Pub. L. 116-136 (2020).

[4] 42 U.S.C. §§5121 – 5207.

[5] 42 U.S.C. §2000bb *et seq.*

[6] 42 U.S.C. §5151.

[7] 44 C.F.R.§§206.11 and 206.36.

## PARTIES

1.      Plaintiffs are pastors and their churches, organized and existing under Colorado law, as follows:

a. Pastor Robert Enyart and Denver Bible Church, ministering to the community of Wheat Ridge in Jefferson County, Colorado.

b.  Pastor Joey Rhoads and Community Baptist Church, ministering to the community of Brighton in Weld and Adams Counties, Colorado.

2.      Plaintiffs conduct ministries involving religious services and fellowship activities for congregations of more than fifty (50) people. The ministries are dependent upon gathering together as a group, speaking, praying, baptizing, displaying facial expressions of human emotions, singing, standing, embracing, shaking hands, conducting marriages, funerals, ordination and communion services

3.      Plaintiff churches seek to protect their interests in the free exercise of religion, speech and assembly.  The churches have associational standing because (a) the interests they seek to protect are germane to their purpose; and (b) neither the claims asserted nor the relief requested require the participation of individual members in the lawsuit since the church members would have standing to assert claims for the deprivation of their own constitutional rights, as set forth herein. Plaintiffs seek declaratory and injunctive relief which, if granted, will inure to the benefit of the church members actually injured.

4.      Defendant Polis is the Governor of the State of Colorado and the other Defendants are agents and agencies of the federal and state governments, as follows:

a.        Defendant Alex M. Azar II is the Secretary for Defendant U.S. Department of Health and Human Services ("HHS"). "HHS is awarding emergency grants and cooperative

agreements funded under the Coronavirus Aid, Relief, and Economic Security (CARES) Act, 2020…." Ex 1, HHS guidance, attached hereto and incorporated.

b.      Defendant Chad F. Wolf ("Wolf") is the Acting Secretary for Defendant U.S. Department of Homeland Security ("DHS"). The Homeland Security Act of 2002, 6 U.S.C. §§ 101-557, consolidated component agencies, including the Federal Emergency Management Agency ("FEMA"), into DHS. All functions of all officers, employees, and organizational units of DHS are vested in the Secretary. "As of July 10th, FEMA and HHS have obligated $133.6 billion in support of COVID-19 efforts." Ex 2, DHS press rel. 7/13/20.

c.      Defendant Steven T. Mnuchin ("Mnuchin") is Secretary for Defendant U.S. Department of the Treasury, which has made total "allocations" to Colorado state and local governments of $2,233,011,164.20. Ex 3, Treas. guidance, 6/30/20, attached hereto and incorporated.

d.      Defendant Jared Polis ("Polis") is Governor of the State of Colorado; and

e.      Defendant Jill Hunsaker Ryan ("Ryan") is Executive Director of Defendant Colorado Department of Health and Environment (the "CDPHE"). The CDPHE is a state agency for which Ryan is the head, pursuant to C.R.S. §25-1-102(1).

## JURISDICTION AND VENUE

5.      This action raises federal questions under the United States Constitution and federal statutes for Civil Rights, 42 U.S.C. §1983, the Religious Freedom Restoration Act, 42 U.S.C. §2000bb-3(a), the Stafford Act, 42 U.S.C. §5151, its regulations in 44 C.F.R. §§206.11 and 206.36 (c)(1), as well as supplemental state law questions, and 5 U.S.C. §702, the Administrative Procedure Act.

6.      This Court has subject matter jurisdiction under 28 U.S.C. §§1331 (federal questions) and 1343 (civil rights) and 1367 (supplemental jurisdiction).

7.      This court's authority to grant declaratory and injunctive relief arises under 28 U.S.C. §§ 2201 (declaratory) and 2202 (further relief) and reasonable attorneys' fees and costs under 42 U.S.C. §1988.

8.      Venue is proper in this Court under 28 U.S.C. §1391(b)(2) because the actions giving rise to the claims herein occurred in the District of Colorado.

**FACTUAL ALLEGATIONS**

**World Health Organization**

9.      On January 30, 2020, the World Health Organization ("WHO") declared, due to concern for countries "with weaker health systems," a "public health emergency of international concern over the global outbreak of novel coronavirus" Ex 4, WHO statement 1/30/20, attached and incorporated.

10.     WHO did not recommend limiting trade or movement but called for accelerated development of "vaccines, therapeutics and diagnostics." Ex 4, WHO stmt.

**The United States Department of Health and Human Services**

11.     HHS leads a federal interagency response to the aforesaid novel coronavirus.

12.     As of March 3, 2020, Defendant Department of Homeland Security is "augmenting the HHS Secretary's Operations Center" with personnel who are "assisting the HHS-led interagency response through increased support and coordination." Ex 5, DHS 4-6-20.

13.     As of July 10, 2020, "FEMA and HHS have obligated $133.6 billion in support of COVID-19 efforts." Ex. 2.

14.     Retroactive to January 27, 2020, Defendant Azar declared a national Public Health Emergency ("PHE") on January 31, 2020, "to aid the nation's healthcare community in responding to 2019 novel coronavirus." He asserted as authority Section 319 of the Public Health Service Act, 42 USC §247d-3a, on behalf of HHS. Ex 6, PHE, and Ex 7, HHS press rel. 1/31/20, attached and incorporated.

15.     However, Azar stated: ". . . . the risk to the American public remains low at this time, and we are working to keep this risk low." Ex 7, HHS press rel.

16.     Azar's PHE stated it was pursuant to the "declaration by the World Health Organization that spread of the virus constituted a public health emergency of international concern." Ex 7, HHS press rel.

17.     HHS, by January 31, 2020, was already "collaborating with industry" regarding vaccines and therapeutics, and the Centers for Disease Control and Prevention ("CDC") **was already "working closely with state health departments**." (emphasis added). Ex  7, HHS press rel.

18.     Azar's PHE was "the latest in the series of steps the Trump Administration [had] taken to protect our country." Ex 7, HHS press rel.

**The President and Congress**

19.     Retroactive to March 1, 2020, the President of the United States of America declared a National Emergency Concerning COVID-19 ("National Emergency Declaration" or "NED") stating: "The **Federal Government, along with State and local governments**, has taken preventive and proactive measures to slow the spread of the virus and treat those affected … [by]… issuing a declaration pursuant to section 319F-3 of the Public Health Service Act (42 USC §247d-6d)…" Ex 8**,** NED 3/13/20 (emphasis added), attached and incorporated.

20.    On March 5 and 6, 2020, Congress passed and the President signed HR 6074 Coronavirus Preparedness and Response Supplemental Appropriations Acts 2020 to provide $8.3 billion in aid for virus diagnosis/treatment, money to small businesses, significant funding to HHS for vaccine research and $1.6 billion for USAID, also known as "Phase I."

21.    The President's NED was based on the statement that: "The spread of COVID-19 within our Nation's communities threatens to **strain our Nation's healthcare systems**." Ex 8, NED (emphasis added).

22.    The President asserted as authority to issue the NED, the National Emergencies Act, 50 U.S.C. §1601 *et seq*. Ex 8, NED.

23.    The President declared that the COVID-19 outbreak was "an emergency of nationwide scope, pursuant to section **501(b) of the Stafford Act, 42 U.S.C. §5191**." Exec. Order 13927 6/04/20, 85 FR 35165 (not attached) (emphasis added).

24.    On March 14, 2020, the President signed H.R. 6201, Families First Coronavirus Response Act to provide tax credits for employee absences caused by COVID-19, three months of paid family and medical leave, nearly $1 billion to the states for unemployment insurance costs, and nearly $1 billion for food assistance programs, including for qualifying families whose child's school is closed due to the virus, also known as "Phase II."

25.    On March 27, 2020, the President signed the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act," also known as "Phase III"), providing cash to individuals, couples and parents, $349 billion for small business payroll loans, $46 billion for industry-specific loans such as airlines, cargo carriers and "critical" businesses, $454 billion for the Federal Reserve for business loans, and money for expanded unemployment insurance.

**The Treasury Department**

26.     As Secretary of the Treasury, Mnuchin oversees the interpretation of the CARES Act and provides guidance on the permissible use of payments to government recipients out of the Coronavirus Relief Fund, available only for "costs that were incurred during the period that begins on March 1, 2020, and ends on December 30, 2020 (the "covered period"). Ex 3, Treas. guidance, p. 2.

27.     As of the filing of this complaint, Polis applied for, and Mnuchin and Defendant Department of the Treasury approved, a total sum for Colorado of two billion, two hundred thirty-three million, eleven thousand, one hundred sixty-four and 20/100 dollars ($2,233,011,164.20). Ex 3, Treas. guidance (payments).

**The Appearance of Corruption or Conflicting Interests**

28.     The appearance of corruption or conflicting interest is created by the CARES Act (the "Act") because:

        a.      under the Act, the State Defendants have outrageously and unconscionably punished non-profit churches like Plaintiffs with severe restrictions on gatherings and otherwise, while favoring, through exemptions, for-profit businesses that generate state tax revenues and also exempting government operations.

        b.      exempting large national companies but imposing a drastic "lock down" of local and regional businesses diminishes business income and such smaller business' ability to make financial donations to campaigns that oppose incumbent office holders;

        c.      disaster orders, by already-advantaged incumbent office holders, in what is the 2020 election year, inhibit opposition campaign speech and other expressive and campaign activities normally undertaken by person-to-person speech in churches, restaurants, bars and

other gathering places. Speech, religious and political discourse are physically muzzled by orders mandating masks, social distancing and restrictions on gatherings, all of which also suppress door-to-door campaigning, rallies and meetings.

      d.    the Act creates the opportunity to issue unnecessary extensions of disaster declarations so that incumbents can retain the right to use CARES Act funds for the entire "covered period" ending December 30, 2020. Ex 3, Treasury guidance, p. 1.

      e.    incumbent office holders gain the prospect of becoming overseers of federal aid payments worth billions of dollars under the CARES Act, which sums are capable of being directed to politically helpful groups in what is the 2020 election year.

      f.    under the Act, the opportunity exists for hospitals to exaggerate the number of COVID-19 related expenses because "$100 billion is available to reimburse health care providers (such as hospitals) for expenses related to health care or lost revenues as a result of the coronavirus emergency." Letter by Congressional Budget Office, revised 4/27/20, p. 24 (not attached), https://www.cbo.gov/system/files/2020-04/hr748.pdf.

**CDEA Limits the Governor's Authority in Emergencies**

29.    In 2012, the Colorado Legislature enacted the Colorado Disaster Emergency Act, C.R.S. §24-33.5-701 *et seq* ("CDEA").

30.    Definitions in CDEA include, but are not limited to, the following terms: disaster, emergency, emergency epidemic, pandemic influenza, recovery and response. *Id.*, §703.

31.    CDEA authorizes the governor to issue executive orders under "this Part 7" that "have the force of law," and requires that the governor "shall" declare a "disaster emergency" if the governor "finds a disaster has **occurred** or that this occurrence or the threat thereof is **imminent**." *Id.,* §704(4) (emphasis added).

9

32.     CDEA provides that an executive order shall activate "state, local and interjurisdictional disaster emergency plans," and that the governor becomes the commander-in-chief of "any organized and unorganized militia.…" *Id.,* §704(5)-(6).

33.     CDEA authorizes the governor to convene advisors, suspend "regulatory statutes" and procedures "for the conduct of state business" if "strict compliance" would "prevent, hinder or delay" coping with the emergency," compel evacuations and routes of ingress/egress, control a disaster area, alcoholic beverages, firearms, explosives, and combustibles, and determine the sharing of non-federal costs as required by 42 U.S.C. §5121 *et seq*., the Robert T. Stafford Disaster Relief and Emergency Assistance Act. *Id.,* §704(6.5)-(7)(j).

34.     CDEA, §704 (2)(d,) confines the governor and the director of CDPHE to their authority under the Colorado Constitution, and they are not authorized to promulgate laws of general applicability in lieu of the Colorado legislatture.

**Polis Exceeded the Scope of his Authority to Declare a Disaster**

35.     On March 11, 2020, purportedly pursuant to CDEA, Polis issued an executive order declaring a "disaster emergency" due to the "presumptive presence" of coronavirus disease 2019 in Colorado, ostensibly causing "**strains [on] the resources of our emergency medical facilities and personnel**" for which he ordered measures designed to maximize the "**chances of avoiding widespread disruptions to our economy**…"  (emphasis added). Ex 9**,** EO-03, p. 1-2, attached and incorporated.

36.     Polis had no authority under CDEA to declare a disaster emergency to avoid "widespread disruptions to our economy" or to prevent "strains on medical facilities and personnel."

37.     In fact, Polis' emergency declaration is causing major economic disruption to the Colorado economy and disruptions to medical facilities, some of which furloughed their personnel and contributed to the economic disruption.

38.     Up until the filing of this action, Polis has continued to issue a blizzard of executive orders including one issued July 21, 2020, ordering individuals to wear "non-medical face coverings." Ex 16, EO-142, attached and incorporated.

39.     By invoking a "disaster" in EO-03 for the purpose of maximizing the "**chances** of avoiding widespread disruptions to **our economy**," Polis exceeded his statutory authority to declare a disaster emergency.

40.     CDEA required Polis to find that "a disaster [i.e., the widespread loss of life] **has occurred** or that this occurrence or the threat **thereof is imminent,**" rather than conjectured to occur at a non-imminent, though possible time in weeks or months in the future. C.R.S. §24-33.5-704(4) (emphasis added).

41.      Under CDEA, §703(3.5), the "presumptive presence" of coronavirus disease violates the statutory meaning of a "disaster," which requires "the occurrence or imminent threat of widespread or severe damage, injury, or loss of life or property" and the statutory meaning of an "emergency" requiring an "immediate response". A statutory "disaster" **does not include disruptions to the economy** or "strains on the healthcare system" for purposes of invoking Polis' authority under CDEA.

42.     Nor did the mere existence of "presumptive positive" cases amount to an "imminent" and "widespread loss of life" under C.R.S. §24-33.5-703(3.5) inasmuch as death had not "occurred" in Colorado, and elsewhere the lethality rate was very low across the general population, not widespread, and effective treatments were readily available in Colorado

43.     Polis' EO-03, as amended, and later orders are not entitled to a presumption of conclusive validity as to the existence of an emergency because EO-03 fails to comply with CDEA's requirements and the allocation of federal assistance under the CARES and Stafford Acts creates an appearance of corruption or conflicting interests, as set forth, *supra.*

44.     The only ways to end the state of emergency is by order of this Court, the Governor's order, or a joint resolution by the legislature. The legislature adjourned on June 15, 2020, without terminating Polis' declaration of disaster emergency, resulting in the prospect of future executive orders *ad infinitum* unless the topic is taken up by the 73rd General Assembly, if it convenes in regular session on January 21, 2021, nearly six months after the filing of this complaint and nearly ten months after the orders began.

**The Governor Exceeded his Authority to Issue Further Executive Orders**

45.     The governor's authority to issue executive orders is restricted generally to evacuations, the control of ingress/egress to disaster areas, and those actions contained in CDEA, C.R.S. §24-33.5-704.

46.     However, subsequent to issuing his unauthorized declaration of a disaster in EO-03, Polis continuously exceeded the scope of his statutory authority more than 150 times, as of the filing of this complaint. Moreover, Polis' orders are voluminous, dizzying in frequency, and lacking in language and format precise enough to give notice to ordinary persons as to what is prohibited or mandated and as to whom the orders apply. Ex 18, list of EOs thru EO 152, attached and incorporated.

47.     On March 22, 2020, Polis issued EO 13, directing **all employers, which includes Plaintiffs,** to "reduce in-person work…by at least fifty (50 percent)," exempting numerous

employers, but making **no specific reference to churches** as being either covered or exempt. Ex 10, EO 13 staff reduction, attached and incorporated.

48.　　On March 25, 2020, Polis issued EO 17, ordering "all Coloradans to **stay at home**, subject to limited exceptions….," and ordering the closure of all businesses **other than** "Critical Businesses" but making **no specific reference to churches** as being either covered or exempt. Ex 11, EO 17, stay at home, attached and incorporated.

49.　　On April 6, 2020, Polis issued EO 24, amending and extending the "**stay at home**" order in EO 17. Ex 12, EO 24, stay at home, attached and incorporated.

50.　　On April 27, 2020, Polis issued EO 44, "**safer at home**," ordering Defendant Ryan, among other things, to **prohibit gatherings of ten (10)** persons or more, limit social interactions and travel, require symptom screening, require social distancing, and permitting "critical businesses and government functions" **to operate** under certain conditions. Ex 13, EO 44, safer at home, attached and incorporated.

51.　　EOs 13, 17, 24 and 44 may have expired by their terms, but a declaration of their invalidity from this Court is necessary to prevent Polis from simply re-issuing the same terms in future orders. *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 U.S. 2012, 2019 n.1 (2017) (holding that subsequent events must make it absolutely clear that wrongful conduct could not reasonably be expected to recur).

52.　　On or about May 12, 2020, Polis hosted a virtual telephonic meeting with hundreds of members of the Colorado clergy, during which meeting he stated at least three times that churches were required to limit worship service gatherings to ten (10) or fewer persons, and intimated that Plaintiffs and others similarly situated could be prosecuted for violating EO 44 and related PHOs, described below.

53.     On July 6, 2020, in EO 125, Polis extended and amended his "declaration of disaster" contained in EO 03 for the **fifth time** (preceded by amend/extend orders in EO 32, 58, 76 and 109). Ex 14, EO 125, attached and incorporated.

54.     On July 16, 2020, Polis issued EO 138, amending/extending prior orders, citing Goldman Sachs, a powerful global investment firm, for authority that a "**federal mask mandate** could save the U.S. economy" from a "hit" to GDP," and requiring individuals, subject to "several exceptions," to "wear a non-medical face covering over their **nose and mouth**." EO 138 applies to persons over ten (10) years of age while inside any "public indoor space" and persons waiting for or inside listed transportation methods, exempting persons "officiating at a religious service," persons who are "hearing impaired or otherwise disabled," persons communicating with someone hearing impaired **"where the ability to see the mouth is essential to communication,"** persons "seated at a food service establishment," persons who are "exercising with others from the individual's household and a face covering would interfere with the activity," *etc*. Ex 15, EO 138, attached and incorporated.

55.     EO 138 does not exempt persons who simply want to attend but not officiate at religious services, although entire counties may "choose to be exempt."

56.     EO 138 provides: "Except as modified by this Executive Order, all Executive Orders or Public Health Orders, including Public Health Order 20-31, issued due to COVID-19 and that are currently in effect shall remain in full force and effect as originally promulgated."

57.     EO 138 does not specify which Executive Orders are "currently in effect."

58.     On July 21, 2020, Polis issued EO 142, amending/extending prior orders including EO 123. Ex 16, EO 142, attached and incorporated, and on July 23, 2020, Polis issued EO 144, extending EOs 91, 123 and 142. Ex 17, EO 144, attached and incorporated.

59.     Polis' EOs are invalid because they exceed his statutory authority under the CDEA, C.R.S. §24-33.5-704, which is limited to:

a. activating "state, local and interjurisdictional disaster emergency plans,"

b. becoming the commander-in-chief of "any organized and unorganized militia.…" §704(5)-(6),

c. convening advisors,

d. suspending statutes and procedures "for the conduct of state business" if "strict compliance" would "prevent, hinder or delay" coping with the emergency,"

e. compelling evacuations and routes of ingress/egress,

f. controlling a disaster area as set forth in the statute,

g. controlling alcoholic beverages, firearms, explosives, and combustibles, and

h. determining the sharing of non-federal costs as required by 42 U.S.C. §5121 *et seq.*, the Robert T. Stafford Disaster Relief and Emergency Assistance Act. Sec. 704(6.5)-(7)(j).

60.     Polis' EOs are invalid because he has no authority to violate the Colorado Constitution under CDEA or other statutes.

**The Claims Against Ryan's PHOs**

61.     On March 12, 2020, Ryan began issuing orders with PHO 20 and continued to issue orders up to the PHO 32 and Amended PHO 31, issued July 10 and 21, respectively, and Ninth Amended PHO 28 and Second Amended PHO 20, issued July 30, 2020. A listing of PHOs printed August 8, 2020 from an official website is attached as Ex 19**,** ("Official List of PHOs") and incorporated herein.

62. **PHO 23.** On March 20, 2020, Ryan issued "Amended Public Health Order 20-23" ("PHO 23"). Ex 20, PHO 23, attached and incorporated.[8]

a. PHO 23 prohibits "mass gatherings" of "no more than ten (10) people to slow the spread of the COVID-19 virus," citing C.R.S. §25-1.5-101(1)(a) and (2)(a)(10). PHO 23 ¶¶ 3, 6.

b. However, PHO 23 defines "mass gatherings" according to CDC Interim Guidance for Coronavirus Disease (COVID 19),  dated March 15, 2020, as "a planned or spontaneous event with a large number of people in attendance **that could strain the planning and response resources of the community hosting the event**, such as a concert, festival, conference, or sporting event."

c.  PHO 23 does not define the meaning of "the community hosting the event."

d. PHO 23 does not define the meaning of the phrase "strain the planning and response resources."

e. PHO 23, by failing to define its terms, fails to give notice of its meaning to persons of ordinary intelligence.

f.  **PHO 23 is void for vagueness** in regard to the meaning of a "planned or spontaneous event with a large number of people in attendance that could strain the planning and response resources of the community hosting the event, such as a concert, festival, conference or sporting event."

g. In the alternative, Plaintiffs' religious **services and activities do not fall within the definition** of "mass gatherings" contained in PHO 23 and the CDC guidelines because

---

[8] The original version of PHO 23 could not be found on the Official List of PHOs at the time of this complaint.

attendance at Plaintiffs' services and activities **do not** "strain the planning and response resources of the community hosting the event."

      h. **PHO 23** §II, ¶¶A-H, is in violation of the Stafford Act, its regulations and RFRA by discriminating against Plaintiffs on the basis of their religion while exempting thousands of individuals from its prohibition of "mass gatherings," specifically:

          (1) the state legislature

          (2) legislative bodies of municipal governments

          (3) municipal courts

          (4) airports

          (5) bus stations

          (6) train stations

          (7) health care facilities

          (8) grocery stores

          (9) retail stores

          (10) pharmacies

          (12) spaces where (10) or more persons may be in transit for essential goods and services)

          (13) restaurants offering delivery and take out

          (14) office environments

          (15) state government buildings

          (16) county government buildings

          (17) factories

          (18) newspaper services

          (19) television services

          (20) radio services

(21) other media services

(22) child care facilities

(23) homeless shelters

(24) emergency facilities necessary for the response to the events

63.     **PHO 24.** On March 22, 2020, Ryan ordered "**Fifty Percent Reduction in Nonessential Business In-Person Work and Extreme Social Distancing**," directed to "**all Colorado employers**" except "**critical businesses**" and "**critical government functions,**" PHO 24 Sec. I, ¶ ¶ (A)-(B), listed in Sec. II. Ex 21, stay at home, attached and incorporated. The staff reduction and social distancing rules did not apply to:

   **a. Critical Businesses**

   (1) healthcare operations (ten categories)

   (2) critical infrastructure (ten categories)

   (3) critical manufacturing (twelve categories)

   (4) critical services (eleven categories)

   (5) news media (four categories)

   (6) financial institutions (three categories)

   (7) providers of basic necessities to economically disadvantaged populations (three categories)

   (8) construction (housing, electricians, plumbers, safety, sanitation and others)

   (9) defense (aerospace, military, security and intelligence-related supporting state, local and U.S. and contractors)

   (10) critical services for residential safety/sanitation (ten categories)

   (11) Vendors providing critical services or products (five categories)

   **b. Critical Government Functions**

   (1) public safety (six categories)

(2) emergency response

(3) judicial branch operations

(4) emergency medical (four categories)

(5) emergency shelters

(6) communications (main hubs for telephone, broadcasting equipment for cable systems, satellite

(7) dish systems, cellular systems, television, radio and other emergency warning systems

(8) public utility plan facilities (hubs, treatment plants, substations, pumping stations, power and gas)

(9) transportation (public transportation, infrastructure, airports, helicopter pads, control towers, air traffic control centers, emergency equipment hangars, road construction/maintenance

(10) hazardous material safety

(11) service to at-risk populations and vulnerable individuals

(12) any government service required for public health, safety or functionality

64.     PHO 24 **did not** refer to **churches** at all, even though they are "Colorado   employers."

Plaintiffs did not know if they were subject to the criminal penalties contained in PHO 24, defined in C.R.S. §25-1-113 to include fine or imprisonment.

65.     **PHO 24A**. Four days after issuing the original iteration of PHO 24, Ryan issued an "update" on March 26, 2020 by a superseding order, still numbered as PHO 24, but with a different title: **"Implementing Stay at Home Requirements"** (numbered herein as "PHO 24A"). Ex 22, PHO 24A, attached and incorporated. The changes between PHOs 24 and 24A[9] cannot be verified without a line-by-line comparison of the documents.

_____

[9] Version PHO 24A, Ex. 22, dated March 26, 2020, was no longer available on the Official List of PHOs at the time of this complaint. See Exhibit 19, Official List of PHOs.

66.     Although the title did not indicate a new term applying to Plaintiffs, PHO 24A contained a new provision for "Houses of worship," stating they "**may** remain open," however, these institutions are "**encouraged** to implement electronic platforms to conduct services whenever possible or to conduct smaller (10 or fewer congregants), more frequent services to allow strict compliance with Social Distancing Requirements." Ex 22, PHO 24A ¶ III (C) (5). The language of PHO 24B appeared to permit Plaintiffs to remain open without being subject to its criminal penalties.

67.     **PHO 24B.** One day after issuing PHO 24A, Ryan issued PHO 24B on March 27, 2020, superseding portion of "Order 20-24"and "20-23." As with all of the PHO updates and amendments, the changes cannot be verified without a line-by-line comparison of the documents. Ex 23, PHO 24B, attached and incorporated.

68.     **PHO 24C.** Five days after issuing PHO 24B, Ryan issued another "update" on April 1, 2020, in a superseding order with the same number and the same title: "**Implementing Stay at Home Requirements**." (numbered herein as "PHO 24C"). Ex 24, PHO 24C, attached and incorporated.

a. PHO 24C ordered confusing mandates and prohibitions couched in permissive terminology, including to "stay at home **whenever possible,**" to social distance **"to the greatest extent possible,"** to leave residences **"**only to perform or utilize **Necessary Activities."**

b. PHO 24C prohibited "all public and private gatherings of any number" except as "expressly permitted in this PHO which include Essential Activities."

c. PHO 24C ordered "all employers" to observe social distancing requirements "at all times."

d. PHO 24C stated that "houses of worship" were a "Critical Service" which "**may** remain open, however, these institutions are **encouraged** to implement electronic platforms to conduct services."

69.     **PHO 24D**. Ryan issued another "update" on April 9, 2020 ("PHO 24D"), superseding PHOs 24, 24A, 24B and 24C. "Houses of worship" were again listed as Critical Services which "**may** remain open, however, these institutions are **encouraged** to implement electronic platforms to conduct services" PHO 24D ¶ III (C), 5. Ex 25, PHO 24D, attached and incorporated.

70.     As early as April 14, 2020 health officials admitted that the rate of new cases in Colorado appeared to be plateauing yet, months later, the EOs and PHOs are still in effect.

71.     **PHO 28.** On April 26, 2020, Ryan issued PHO 28, titled "**Safer at Home**," purporting to supersede PHOs 22 and 24, as amended, designating "Houses of Worship" as "Critical Services" that **may** remain open" but were **encouraged** to implement electronic platforms. Ex 26, PHO 28, attached and incorporated.

72.     **PHO 28A** and **28B**. On May 4 and May 8, 2020, Ryan issued superseding orders with the same name, "**Safer at Home.**" ("PHOs 28A and 28B"). In both orders, "Critical Business" contains a sub-category, "Critical Services," Appx. F, p. 28-9, wherein "Houses of worship" were again shown as: "**may** remain open, however, these institutions are **encouraged** to implement electronic platforms to conduct services" Ex 27 and 28, PHOs 28A and 28B, attached and incorporated.

73.     **PHO 28C** thru **PHO 28E**. Ryan issued superseding orders, confusingly using the same name, "**Safer at Home**" ("PHOs 28C, 28D and 28E") on May 14, 26 and June 2, respectively. PHO 28C, Appx. F, p. 29, and PHO 28D, Appx. F, p. 29-30, use the same language regarding

Houses of Worship stating they "**may** remain open" but were "**encouraged** to implement electronic platforms." Ex 29, 30 and 31, PHOs 28C, 28D and 28E, respectively, attached and incorporated.

74.     **PHO 28F (Sixth Amended)** and **PHO 28G (Seventh Amended)**. Ryan issued superseding orders confusingly using the same number "28," but using a new name **"Safer at Home and in the Vast, Great Outdoors"** ("PHOs 28F and G"), on June 5 and 18, respectively.

75.     However, **PHO 28F** (June 5, 2020) the sixth iteration of PHO 28, without an indication in the title and buried in the convoluted text of **PHO 28F**, Appx. F, p. 32, inserted a new provision: "Houses of worship may operate **as authorized in Sec. II, M of this Order.**" (emphasis added). Ex 32, PHO 28F, attached and incorporated.

76.     The said Section II, M, p. 11-12 (of PHO 28F), does not contain the permissive language of PHOs 28 thru 28E. Instead, it contains a litany of minute regulatory orders while confusingly mixing permissive language, i.e. "encouraged" and "should," with mandatory language, i.e. "must, "shall," and "as authorized."

77.     **PHO 28G (Seventh Amended)** contains the same confusing provisions just described for PHO 28F. Ex 33, PHO 28G, attached and incorporated. As with all of the PHO updates and amendments, the changes cannot be verified without a line-by-line comparison of the documents.

78.     **PHO 28H (Eighth Amended).** Ryan issued a superseding order on June 30, 2020, using the same name "**Safer at Home and in the Vast, Great Outdoors**" ("Eighth Amended PHO 28"), stating, p. 2, that the work to "flatten the curve" appeared to be succeeding. Ex 34, PHO 28H, attached an incorporated. Again, changes cannot be verified without a line-by-line comparison of the documents.

79.     PHO 28H (i.e., the Eighth Amended version of PHO 28), p. 2, does not state that it supersedes PHOs 28 through 28G, but only that it supersedes PHOs 22 and 24, as amended. Therefore, PHOs 28A thru G are still in effect. PHO 28H contains a total of 48 pages, not including the pages contained in hyperlinks referenced in the order's text.

80.      PHO 28 thru 28H have titles that fail to notify Plaintiffs that churches are subject to criminal penalties contained therein because the titles refer to "home" and "outdoors," not to churches.

81.     **PHO 28H**, **Appx. F, p. 34,** contains a confusing mix of permissive and mandatory language: "Houses of Worship **may** operate **as authorized** in **Section II, M** of this Order."

82.     The said **Section II, M**, "Houses of Worship," in **PHO 28H**, p. 13, again contains a litany of minute regulatory orders that confusingly mix permissive language, i.e. "encouraged" and "should" with mandatory language, i.e. "must," "shall" and "as authorized," while also incorporating three hyperlinks, themselves labeled twice as permissive "guidance" or "guidelines":

   a. "Houses of worship are encouraged to implement electronic platforms to conduct services whenever possible or to conduct more frequent services of 10 people or less to allow for compliance with **Social Distancing Requirements**. Effective June 4, 2020, houses of worship may open to 50% of the posted occupancy limit indoors not to exceed 50 people, whichever is less, per room, while meeting the 6 feet distancing requirements in every direction between non-household members. Effective June 18, 2020, extra large houses of worship may operate up to 100 people indoors within their usable space calculated using the Social Distancing Space Calculator. [hyperlink]. For outdoor services, a house of worship must maintain 6 feet distance between non-household members and work with the appropriate local authority to obtain approval for the maximum number of individuals who may attend in the designated outdoor space. In addition to meeting the requirements of Section II. I of this Order, houses of worship shall also meet the following requirements:

      1.  Face coverings are strongly encouraged to be worn by staff, volunteers and congregants while on the premises of the house of worship, except for

children 2 years old and under, those with trouble breathing, or those unable to remove a mask without assistance.

2. Houses of worship should follow the <u>Colorado Department of Health and Environment Cleaning Guidance [hyperlink]</u> as well as the <u>CDC guidelines for Cleaning and   Disinfecting Your Facility [hyperlink]</u> in preparing their buildings prior to, during and following any gathering. Restrooms and the worship space, particularly any metal or plastic on chairs, and all high touch surfaces or shared objects must be cleansed and disinfected between services."

83.     PHO 28H, Ex 34, uses both permissive and mandatory language in stating, p.2: "Individuals are urged to wear non-medical cloth face covering that cover the nose and mouth whenever in public as required by Executive Order D 2020 091 as amended by Executive Order D 2020-123."

84.     **PHO 28H, Section II, I** (incorporated into Section II, M, as quoted above), imposes additional measures on Plaintiffs as are imposed on "All Businesses and Government Functions," which "shall all follow the protocols below [consisting of more than two pages]."

85.     **PHO 28H, Sec. II, M** restricts Plaintiffs' "indoor congregations to "50% of the posted occupancy limit indoors not to exceed 50 people, whichever is less, per room, while meeting the 6 feet distancing requirements…." Furthermore, for outdoor services, Plaintiff must "work with the appropriate local authority to obtain approval…."

86.     The language of Sec. II, M ordering "to work with the appropriate local authority" grants officials unbridled discretion to approve Plaintiffs' outdoor services without any notice to Plaintiffs of the requirements for such approval and without guidance to officials on enforcing violations of such approval.

87.      Furthermore, the "appropriate local authority" is not defined by PHO 28H, Sec. II, M.

88.     PHO 28H **favors non-churches**, that is, it permits businesses, together with state and local government operations, to gather indoors with more than 50% of their posted occupancy

and to gather outdoors without "working with the appropriate local authority to obtain approval…." Ryan has issued a "Ninth Amended" iteration of PHO 28. Ex 41, PHO 28 "I," attached and incorporated.

89.     Under Ryan's authorization, variances have been issued to numerous counties, exempting them from compliance with PHO 28H.

90.     On or about May 14, 2020, a representative of Tri-County Health Department which enforces these orders in Adams, Arapahoe and Douglas Counties, CO, effectively **threatened criminal prosecution**, including imposition of fines up to $1,000 and one year in the county jail for violations of EO-44 and PHO 20-28B. On July 24, 2020, Jefferson County issued PHO 20-008 ordering face coverings in public "supplementing the requirement of other state face covering orders" by Polis and Ryan, threatening penalties of up to $5,000.00 and one year in jail. Ex 40, Jeffco PHO 008, attached and incorporated.

**The Ryan Orders are Void for Vagueness**

91.     On or about April 24, 2020, Plaintiff Pastor Enyart phoned the Colorado Department of Health for assistance in determining which of the State Defendants' orders applied to DBC due to conflicting information on websites published by Polis and Ryan. Ex 35, affid. Enyart, attached and incorporated.

92.     In his phone call, Pastor Enyart explained that the State Defendants had published nearly forty separate government press releases, web pages, PowerPoints, PDFs, and articles and he said: "As a pastor, I'm supposed to consolidate all that into clear guidance for our church members. But with what you're all giving us, that's impossible." Ex 35.

93.     The health department representative literally laughed, though politely, and said, "Really, we don't know the answers," and further said, "I feel bad that I can't disagree with what you're saying. It's really a mess." Ex 35, affid.

94.     Plaintiff Rhoads and the church staff have been unable to learn the exact meaning of the government's orders despite phone calls to the government offices, searching websites, asking fellow clergy and listening to clergy calls with the governor. At no time have Plaintiffs been given notice and hearing for the deprivation of their First Amendment rights.

**RFRA and the Stafford Act and Polis' Request for Federal Assistance**

95.     In 1993, Congress enacted the Religious Freedom Restoration Act, 42 U.S.C.§2000bb *et seq.* ("RFRA"), to restore the compelling interest test in cases where free exercise of religion is substantially burdened.

96.     Under 42 U.S.C.§2000bb-3, entitled "Applicability," RFRA applies to "all federal law and the **implementation** of that law, **whether statutory or otherwise**…." and "federal statutory law" is subject to RFRA "unless such law **explicitly excludes** such application by reference to this chapter." (emphasis added)

97.     Importantly, neither the CARES Act nor the Stafford Act excludes the application of RFRA.

98.     On March 25, 2020, Polis made a written request ("Polis Letter") to the President of the United Stated, through the regional administrator for FEMA, under Section 401 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. §§ 5121-5207, asking the President to declare a major disaster in Colorado due to COVID-19 and to grant monetary financial assistance under various Stafford Act programs and under the Hazard Mitigation Grant Program authorized by 42 U.S.C. §§ 5170c and 5172, implemented by 44 C.F.R. §206.266.

Ex. 37, Polis Letter, pp. 6-8, attached hereto and incorporated.

99.     CDEA's text contemplates the "implementation of federal law" by containing a provision specifically authorizing the governor of Colorado to determine the sharing of non-federal costs as required by 42 U.S.C. §5121 in the Stafford Act. C.R.S. §24-33.5-704(6.5)-(7)(j).

100.    The Polis Letter, Ex 37, pp. 6-7, **specifically justified its request for federal moneys upon the above-listed EOs and PHOs** issued pursuant to CDEA by Defendants Polis and Ryan between March 11 and March 24, 2020, making the CDEA, the EOs and PHOs integral to the implementation of the President's NED, the CARES Act and the Stafford Act.

101.    The "implementation" of the CARES Act and Stafford Act together with the President's NED, *supra,* and Azar's PHE, *supra,* are the "implementation of federal law" under RFRA, 42 U.S.C. §2000bb-3, by means of state law in CDEA and the State Defendant's EOs and PHOs. *See* 44 C.F.R. §206.37 (processing requests). Defendant Mnuchin and Defendant Treasury awarded Polis' requested funds pursuant to 42 U.S.C. §247d and the CARES Act.

102.    The approval of FEMA assistance requires the execution of a FEMA-State Agreement and execution of an applicable emergency plan "ensuring" that states "embrace mitigation efforts," which Polis submitted as the EOs and PHOs disputed herein. Ex 38, copy of 44 C.F.R. §206.44, attached and incorporated herein.

103.    Defendant Wolf and Department of Homeland Security, through FEMA, approved Polis' request for assistance under the Stafford Act. Ex 39, gov. press rel. 3/29/20, attached and incorporated.

104.    Section 308 of the Stafford Act was amended by the Post-Katrina Emergency Management Reform Act of 2006 to prohibit discrimination on the basis of religion.

105.    The CDEA and Defendants' EOs and PHOs substantially burden Plaintiffs' free exercise of religion in violation of the First Amendment, RFRA, Section 308 of the Stafford Act and its implementing regulations in 44 C.F.R. §§206.11 and 206.36.

106.    Polis issued EO 24 through 24D, declaring his "actions and prohibitions" were necessary, "due to…the Declaration of … a National Emergency by the President of the United States on March 13, 2020," highlighting further that the State Defendants actions were not merely an internal state initiative but were carried out in order to obtain assistance from the Federal Defendants.

107.    Defendants' EOs and PHOs restrict or prevent religious speech and the expression of personal communication in how closely Plaintiff Pastors can be to persons in their congregations, and in how closely congregants can be to each other, to meet, pray, talk, stand, sit, walk, sing, pray, embrace, shake hands, smile or facially express their thoughts, opinions and emotions verbally and through facial expression. Moreover, Plaintiffs are restricted in holding baptisms, communion services, marriage ceremonies and laying of hands.

108.    Defendants' EOs and PHOs suppress the attendance at Plaintiffs' worship services by restricting members from freely leaving their homes to attend worship services.

109.    If Plaintiffs comply with the mandates contained in the orders, they violate their sincerely held religious beliefs and if they do not comply, they pay a heavy price.

110.    CDEA is not a general, neutral, non-discriminatory statute because it exempts activities involving the "course or conduct of a labor dispute," the "dissemination of news or comment on public affairs," and also exempts "police forces," "fire-fighting forces," and "armed forces," but does not exempt Plaintiffs' religious services or activities which are protected by the First Amendment. C.R.S. §24-33.5-702(2). The fact that CDEA gives exemptions to thousands of

people negates the purported reason for subjecting Plaintiffs to State Defendants' oppressive EOs and PHOs.

111.    CDEA, the EOs and PHOs lack a compelling state interest to restrict Plaintiff rights because of the voluminous exemptions giving more favorable treatment to numerous groups and businesses.

112.    State Defendants admit that the EOs and PHOs exempt: "a range of commercial and nonreligious activities" including, for example, "marijuana dispensaries, liquor stores, hardware stores, laundromats, banks, law offices, accounting offices," and protesters whose conscience "would not allow them to stay home." Also exempted are thousands of people working in government operations.

113.    Providing assistance in obtaining voluntary preventative and therapeutic treatments are less restrictive methods for responding to potential and actual COVID-19 infections rather than discriminating against Plaintiffs for the exercise of their religious rights, as shown by other nations' experiences.

114.    For persons who wish to protect themselves from airborne, molecular virus particles, urging voluntary protective face coverings in public is a less restrictive method than penalizing Plaintiffs for the free exercise of their religious rights.

**The PHOs Violate Colorado's Administrative Procedure Act**

115.    The Colorado Administrative Procedure Act ("APA") requires state agencies to provide procedural due process of law in both rulemaking and adjudicatory proceedings. C.R.S. §25-1.5-101 *et seq*.

116.    Specifically, the APA provides: "The general assembly finds that an agency should not regulate or restrict the freedom of any person to conduct his or her affairs, use his or her property, or deal with others on mutually agreeable terms unless it finds, after a full

consideration of the effects of the agency action, that the action would benefit the public interest and encourage the benefits of a free enterprise system for the citizen of the state. C.R.S. §24-4-101.5.

117.    In violation of the APA, §24-4-102(15), Ryan issued PHOs containing numerous "rules," defined as being "the whole or any part of every agency statement of general applicability and future effect implementing, interpreting, or declaring law or policy or setting forth the procedure or practice requirement of any agency." "Rule" includes "regulation".

118.    Under the APA, §24-4-103: "When any agency is required or permitted by law to make rules, in order to establish procedures and to accord interested persons an opportunity to participate therein, the provisions of this section shall be applicable."

119.    Plaintiffs are "interested persons" in the PHOs described herein.

120.    Ryan and Defendant CDPHE failed to accord Plaintiffs any opportunity to participate in Ryan's issuance of the PHOs, in violation of the APA, §24-4-103.

121.    Ryan issued PHOs as pseudo-legislation, intending them to be substantive standards carrying the force of law, or in the alternative, she issued the PHOs as permissive guidelines but with the threat of criminal enforcement.

122.    Either way, Ryan's PHOs violated procedural due process protections under the Fourteenth Amendment of the United States Constitution as codified by the APA, depriving Plaintiffs of their rights under the First Amendment and in violation of the certification requirement of C.F.R. §206.36 requiring the governor to certify he took appropriate action under state law.

**Plaintiffs have standing.**

123.    Plaintiffs have suffered and continue to suffer actual and imminent injury-in-fact by reason of the Federal Defendants' implementation of federal law in violation of RFRA, the CARES Act and the Stafford Act in approving assistance despite the State Defendants' EOs and PHOs that deprive Plaintiffs of their First Amendment rights without due process of law or legal authority.

124.    Federal Defendants' approvals of assistance to Polis is the causal connection to the deprivation of Plaintiffs' rights because State Defendants would not have deprived Plaintiffs of their rights absent approval and assistance by Federal Defendants.

125.    A favorable ruling by this Court will redress Plaintiffs' injuries.

126.    The orders by State Defendants are not entitled to conclusive validity because (1) the orders were not passed by the Colorado legislature, (2) the CARES Act creates the appearance of corruption or conflicting interests (3) the orders infringe upon First Amendment rights.

**FIRST CLAIM FOR RELIEF**
**Declaratory Judgment that the Federal Defendants Implemented**
**Federal Law in Violation of Plaintiffs' Rights Under RFRA**

127.    Plaintiffs incorporate by reference the above allegations and further allege:

128.    Under 5 U.S.C. §702, Plaintiffs are entitled to declaratory judgment that Federal Defendants implemented federal law, including Azar's PHE, the President's NED and Congressional funding provisions in the Stafford and CARES Acts, while violating Plaintiffs' rights under RFRA by restricting Plaintiffs First Amendment rights.

**SECOND CLAIM FOR RELIEF**
**Declaratory Judgment that the Federal Defendants**
**Violated the Stafford Act's Prohibition against Religious Discrimination**

129.    Plaintiffs incorporate by reference the above allegations and further allege:

130.    Under 5 U.S.C. §702, Plaintiffs are entitled to a declaration that the Federal and State Defendants violated the Stafford Act, 42 U.S.C. §5151(a) and 44 C.F.R. §206.36(c)(1), by discriminating against Plaintiffs on the basis of religion without appropriate legal authority under state law and without notice and hearing.

### THIRD CLAIM FOR RELIEF
### Declaratory Judgment that CDEA Discriminates on its Face and as Applied

131.    Plaintiffs incorporate by reference the paragraphs above and further allege:

132.    Polis and Ryan acted at all times under purported authority contained in CDEA.

133.    CDEA is not a neutral law of general applicability because it facially and as applied to Plaintiffs exempts non-religious organization.

134.    CDEA violates Plaintiffs' rights under the First Amendment and is void.

135.    The EOs and PHOs are void because Polis and Ryan issued them pursuant to the unconstitutional CDEA statute.

### FOURTH CLAIM FOR RELIEF
### Declaratory Judgment that Polis' EOs Exceed his
### Authority Under the Colorado Constitution

136.    Plaintiffs incorporate by reference the above allegations and further allege:

137.    Plaintiffs are entitled to a declaration that Polis' EOs are restricting Plaintiffs from the Free Exercise of Religion in violation of the Colorado Constitution, art. II, Sec. 4.

### FIFTH CLAIM FOR RELIEF
### Declaring Polis' Violated CDEA's Conditions

138.    Plaintiffs incorporate by reference the paragraphs above, and further state:

139.    In the alternative, if  CDEA is not void, Polis violated CDEA by failing to find that a disaster had occurred or that the threat thereof is "imminent."

140.    The EOs and PHOs are void because Polis failed to declare the existence of an

emergency within the definition contained in CDEA.

**SIXTH CLAIM FOR RELIEF**
**Declaratory Judgment that Polis' EOs Exceed the Scope**
**of his Authority under CDEA**

141.    Plaintiffs incorporate by reference the above allegations and further allege:

142.    Plaintiffs are entitled to a declaration that Polis' executive orders are outside the scope of

his authority under CDEA and as such, his executive orders are null and void as to Plaintiffs.

**SEVENTH CLAIM FOR RELIEF**
**Declaratory Judgment that Polis' EOs Violate the First Amendment**
**of the United States Constitution**

143.    Plaintiffs incorporate by reference the above allegations and further allege:

144.    Plaintiffs are entitled to a declaration that Polis' executive orders violate Plaintiffs' rights

under the First Amendment of the United States Constitution to free exercise of religion,

freedom of speech, and freedom of assembly without due process of law.

**EIGHTH CLAIM FOR RELIEF**
**Declaratory Judgment that Ryan's PHOs Violate the First Amendment**
**of the United States Constitution**

145.    Plaintiffs incorporate by reference the above allegations and further allege:

146.    Plaintiffs are entitled to a declaration that Ryan's public health orders violate Plaintiffs'

rights under the First Amendment of the United States Constitution to free exercise of religion,

freedom of speech, and freedom of assembly without due process of law.

**NINTH CLAIM FOR RELIEF**
**Declaratory Judgment that Polis' Orders are Void for Vagueness**

147.    Plaintiffs incorporate by reference the above allegations and further allege:

33

148.    Plaintiffs are entitled to a declaration that Polis' EOs are void for vagueness under the Fourteenth Amendment of the United States Constitution by failing to give notice to persons of ordinary intelligence of the conduct prohibited or mandated, by failing to give adequate guidance to officers responsible for enforcement, and by granting unbridled discretion to those making enforcement decisions.

## TENTH CLAIM FOR RELIEF
### Declaratory Judgment that Ryan's Orders are Void for Vagueness

149.    Plaintiffs incorporate by reference the above allegations and further allege:

150.    Plaintiffs are entitled to a declaration that Ryan's PHOs are void for vagueness under the Fourteenth Amendment of the United States Constitution by failing to give notice to persons of ordinary intelligence of the conduct prohibited or mandated, by failing to give adequate guidance to officers responsible for enforcement, and by granting unbridled discretion to those making enforcement decisions.

## ELEVENTH CLAIM FOR RELIEF
### Declaratory Judgment that Ryan's Orders Deprived Plaintiffs of the Right to Notice and Hearing Under the Fourteenth Amendment and Exceeded Her Authority Under the Colorado APA

151.    Plaintiffs incorporate by reference the above allegations and further allege:

152.    Plaintiffs are entitled to a declaration that Ryan's PHOs violated the Colorado Administrative Procedure Act and in so doing also deprived Plaintiffs of their First Amendment rights and their right to due process right under the Fourteenth Amendment of the United States Constitution.

## TWELFTH CLAIM FOR RELIEF
### Injunctive Relief Against All Defendants

153.    Plaintiffs incorporate by reference the above allegations and further allege:

154.    State Defendants' EOs and PHOs have caused Plaintiffs to suffer irreparable harm for which money damages are unavailable and/or inadequate relief.

155.    Under Fed. R. Civ. P. 57 and 65:

    a.      Plaintiffs are entitled to injunctive relief against State Defendants prohibiting them, their "agents, servants, employees and attorneys" from enforcing or threatening to enforce against Plaintiffs any COVID-19 related executive orders and public health orders issued on or subsequent to March 11, 2020.

    b.      Plaintiffs are entitled to injunctive relief requiring State Defendants to publicize the termination of all such orders by this Court's order in the same manner and using the same means as State Defendants have used to publicize the EOs and PHOs, specifically, using press releases, publishing such press releases on their official websites, and notifying media outlets.

    c.      Plaintiffs are entitled to injunctive relief against Federal Defendants, their "agents, servants, employees and attorneys" prohibiting them from, under the Stafford Act, CARES Act or similar federal law, approving or providing any future assistance to State Defendants after an order by this Court finding Plaintiffs likely to succeed or actually succeeding on the merits of their claims herein.

**PRAYER FOR RELIEF**

    WHEREFORE, Plaintiffs pray for declaratory and injunctive relief as set forth above, for attorneys' fees and costs as set forth in 42 U.S.C. §1988, and for such other and further relief that the Court deems just and proper.

[attorneys listed on the following page]

Respectfully submitted,

MESSALL LAW FIRM, LLC
s/ Rebecca R. Messall
Rebecca R. Messall, CO Bar no. 16567
7887 E. Belleview Avenue, Suite 1100
Englewood, CO  80111
Phone 303.228.1685
Email: rm@lawmessall.com
Attorney for Plaintiffs

BERGFORD LAW
J. Brad Bergford, CO Bar no. 42942
Attorney at Law
3801 E. Florida Ave. Ste. 800
Denver, CO 80210
Phone:  720.980.3989
Email: brad@bergfordlaw.com
Attorney for Plaintiffs