**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Daniel D. Domenico**

Civil Action No. 1:20-cv-02362-DDD-NRN

DENVER BIBLE CHURCH;
ROBERT A. ENYART;
COMMUNITY BAPTIST CHURCH; and
JOEY RHOADS,

      Plaintiffs,

v.

ALEX M. AZAR II, in his official capacity as Secretary, United States
Department of Health and Human Services;
UNITED STATES DEPARTMENT OF HEALTH AND HUMAN
SERVICES;
CHAD W. WOLF, in his official capacity as Acting Secretary, United
States Department of Homeland Security;
UNITED STATES DEPARTMENT OF HOMELAND SECURITY;
STEVEN T. MNUCHIN, in his official capacity as Secretary, United
States Department of the Treasury;
UNITED STATES DEPARTMENT OF THE TREASURY;
GOVERNOR JARED POLIS, in his official capacity as Governor, State
of Colorado;
JILL HUNSAKER RYAN, in her official capacity as Executive
Director, Colorado Department of Health and Environment; and
COLORADO DEPARTMENT OF PUBLIC HEALTH AND
ENVIRONMENT,

      Defendants.

---

**ORDER GRANTING IN PART
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

---

    Plaintiffs in this case are two Colorado churches and their pastors.
Presently before the court is their motion for a preliminary injunction
[Doc. 13], in which they ask the court, among other things, to enjoin

enforcement of certain orders the State of Colorado has put in place in response to the COVID-19 pandemic.

The State rightly argues that during a public-health emergency, courts must be particularly mindful of the complex interaction between constantly evolving scientific understanding and policymaking, and the court recognizes that the decisions being made by the State Defendants here are truly matters of life and death. For the most part, the court, like Plaintiffs and the rest of Colorado's citizenry, must and does defer to State policymakers' weighing of the costs and benefits of various restrictions imposed to minimize the spread of COVID-19.

But the existence of an emergency, even one as serious as this one, does not mean that the courts have no role to play, or that the Constitution is any less important or enforceable. And while the religious, like the irreligious or agnostic, must comply with neutral, generally applicable restrictions, the First Amendment does not allow government officials, whether in the executive or judicial branch, to treat religious worship as any less critical or essential than other human endeavors. Nor does it allow the government to determine what is a necessary part of a house of worship's religious exercise. Those fundamental principles, which involve no balancing or second-guessing of public health officials' scientific analysis or policy judgments, require the court to grant Plaintiffs' motion, in relatively narrow part.

In addition to other neutral and generally applicable restrictions, Colorado currently imposes capacity limits on houses of worship that are more severe than those that apply to other so-called critical businesses whose settings pose a similar risk of COVID-19 transmission, and the State allows a variety of exceptions to its facial-covering requirement where it recognizes that removing a mask is necessary to carry out a

particular activity. The court does not doubt that the State made these decisions in good faith, in an effort to balance the benefits of more public interaction against the added risk that inheres in it. But the Constitution does not allow the State to tell a congregation how large it can be when comparable secular gatherings are not so limited, or to tell a congregation that its reason for wishing to remove facial coverings is less important than a restaurant's or spa's.

Although Plaintiffs have not demonstrated a likelihood of success on the merits of most of their asserted claims, they have demonstrated a likelihood of success on their First Amendment free exercise claim against the State Defendants. Plaintiffs have also shown that the other preliminary-injunction factors weigh in their favor as to their free exercise claim. The court therefore grants Plaintiffs' motion for a preliminary injunction in part. The State Defendants are enjoined from enforcing their Executive Orders and Public Health Orders against Plaintiffs, to the extent those orders treat houses of worship differently from comparable secular institutions. Specifically, the State Defendants are enjoined from enforcing the additional numerical occupancy limitations for worship services, and the requirement that congregants wear face masks at all times during worship services.

## PROCEDURAL HISTORY

Plaintiffs' motion for a preliminary injunction seeks (1) to enjoin the State Defendants from enforcing certain orders they have issued in response to the ongoing COVID-19 pandemic; and (2) to enjoin the Federal Defendants from providing further COVID-19 disaster relief to the State

so long as the State's allegedly unlawful orders remain in effect.[1] [Pls.' Mot., Doc. 13.] Defendants have filed responses opposing the requested preliminary injunction. [State Defs.' Resp., Doc. 41; Fed. Defs.' Resp., Doc. 43.] Plaintiffs have filed replies. [Reply to State Defs.' Resp., Doc. 44; Reply to Fed. Defs.' Resp., Doc. 45.] After examining the parties' briefs, the court requested supplemental information from the parties, which they provided. [*See* Order, Doc. 49; State Defs.' Suppl. Br., Doc. 50; Minute Order, Doc. 51; Resp. to State Defs.' Suppl. Br., Doc. 56.] The court has determined that it is not necessary to hold a hearing on Plaintiffs' motion.[2]

## FACTUAL BACKGROUND

On January 21, 2020, the first confirmed case of COVID-19 in the United States was diagnosed.[3] On January 31, Defendant Azar, the Secretary of Defendant U.S. Department of Health and Human Services,

---

[1]   For purposes of this Order, "State Defendants" means Defendants Jared Polis, Jill Hunsaker Ryan, and the Colorado Department of Public Health and Environment ("CDPHE"). "Federal Defendants" means Defendants Alex M. Azar II, the United States Department of Health and Human Services, Chad W. Wolf, the United States Department of Homeland Security, Steven T. Mnuchin, and the United States Department of the Treasury.

[2]   Federal Rule of Civil Procedure 65(a) does not explicitly require that a hearing be held on a preliminary-injunction motion, and whether a hearing should be held is a matter for the court's discretion. *Carbajal v. Warner*, 561 F. App'x 759, 764 (10th Cir. 2014); *see also Reynolds & Reynolds Co. v. Eaves*, 149 F.3d 1191, 1998 WL 339465, at *3 (10th Cir. 1998) (unpublished table decision) (no 10th Cir. authority requires court to hold evidentiary hearing prior to granting or denying preliminary injunction); Local Civ. R. 7.1(h) (motion may be decided without oral argument at court's discretion).

[3]   Press Release, Ctrs. for Disease Control & Prevention, *First Travel-related Case of 2019 Novel Coronavirus Detected in United States*, CDC Newsroom (Jan. 21, 2020), https://www.cdc.gov/media/releases/2020/p0121-novel-coronavirus-travel-case.html.

declared a public-health emergency in response to COVID-19 pursuant to the Public Health Service Act, 42 U.S.C. § 247d. [Azar Determination, Ex. 6 to Compl., Doc. 1-6.] On March 5, the first presumptive cases of COVID-19 were identified in Colorado.[4] On March 10, Defendant Polis, the Colorado Governor, declared a state of disaster emergency in the State pursuant to the Colorado Disaster Emergency Act ("CDEA"), Colo. Rev. Stat. §§ 24-33.5-701 to 717.[5] [EO D 2020 003, Ex. 9 to Compl., Doc. 1-9 at 2.] On March 13, President Donald Trump declared pursuant to the National Emergencies Act, 50 U.S.C. §§ 1601-51, that the COVID-19 outbreak in the United States constitutes a national emergency that had begun on March 1. [Trump Proclamation, Ex. 8 to Compl., Doc. 1-8.]

Since that time, Governor Polis and Defendant Ryan, the Executive Director of Defendant CDPHE, have issued numerous Executive Orders and Public Health Orders to slow the spread of COVID-19 in Colorado.[6] Among other things, these orders have temporarily closed certain businesses, then permitted them to reopen with precautions in place; restricted gathering sizes at numerous facilities, including churches and other houses of worship; required businesses to implement measures like cleaning and disinfecting high-touch surfaces and ensuring proper ventilation; first required, then encouraged individuals to stay at home

---

[4]   Press Release, Colo. Governor, *Updated Information on COVID-19*, Colo. Off. State Web Portal (Mar. 5, 2020), https://www.colorado.gov/governor/news/updated-information-covid-19.

[5]   The duration of this declaration has since been extended numerous times. The most recent extension remains in effect until October 31, 2020. *See* EO D 2020 205 (Oct. 1, 2020), https://drive.google.com/file/d/1XGqnQjqwojo8QiDHchKcMQFyFWj3ynzw/view.

[6]   *See* CDPHE, *All Public Health & Executive Orders*, Colo. COVID-19 Updates, https://covid19.colorado.gov/prepare-protect-yourself/prevent-the-spread/public-health-executive-orders (last visited Oct. 14, 2020).

or outdoors as much as possible, except to perform necessary activities; required individuals to wear face masks in public indoor spaces, with certain exceptions; and required individuals to maintain a six-foot distance from non-household members in certain public spaces.

Primarily at issue in this motion is Public Health Order 20-35,[7] which is the CDPHE's current implementation of the Governor's "Safer at Home" directives in Executive Order D 2020 091.[8] In Executive Order D 2020 091,[9] the Governor directed implementation of a set of protective measures dubbed Safer at Home, and eased some of the protective measures previously imposed under his "Stay at Home" Executive

---

[7]   2d Am. PHO 20-35 (Oct. 8, 2020), https://drive.google.com/file/d/1 wRxIxSUPE7NSQKf0wnr5P7BB2PAl9h_k/view.

[8]   At the time Plaintiffs' Complaint and motion for preliminary injunction were filed, the operative CDPHE order was the Ninth Amended version of Public Health Order 20-28, issued on July 30, 2020. [Ex. 41 to Compl., Doc. 1-41.] Public Health Order 20-35 issued on September 15, 2020, and supersedes and replaces Public Health Order 20-28. [*See* State Defs.' Notice of Suppl. Auths., Doc. 55.] Public Health Order 20-35 has since been amended, and the Second Amended version is the currently operative CDPHE Safer at Home order at the time of this writing. The State Defendants have, commendably, continued to update and amend their Executive Orders and Public Health Orders as new information about the SARS-CoV-2 virus and the COVID-19 disease becomes available, and as infection rates fluctuate in the State's communities. This, however, presents Plaintiffs and the court with somewhat of a moving target. At least for purposes of assessing Plaintiffs' requested preliminary injunctive relief, the court will consider the Executive Orders and Public Health Orders that are currently in effect.

[9]   EO D 2020 091 (June 1, 2020), https://drive.google.com/file/d/1gzyS bpk2MWLAHzfMaABcHGTKpxxqsHw0/view; *see also* EO D 2020 199 (Sept. 19, 2020), https://drive.google.com/file/d/1j0DZnQbKvU12H_so GI0SgXyB9kUxVZON/view (extending EO D 2020 091 to Oct. 19, 2020).

Order.[10] Also at issue here is Executive Order D 2020 138 [Ex. 15 to Compl., Doc. 1-15],[11] which is incorporated by reference in Public Health Order 20-35, and generally requires individuals to wear face masks in public indoor spaces.

The Federal Defendants, for their part, have provided COVID-19 disaster relief to the State pursuant to the Stafford Act, 42 U.S.C. §§ 5121-5207, and the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, 134 Stat. 281 (2020). On March 25, 2020, Governor Polis requested that President Trump declare a "Major Disaster" for the State of Colorado pursuant to the Stafford Act. [Polis Letter, Ex. 37 to Compl., Doc. 1-37.] On March 28, the President granted that request. Colorado; Major Disaster and Related Determinations, 85 Fed. Reg. 31,541-02 (Mar. 28, 2020). The President's national emergency declaration and Major Disaster declaration for Colorado had the effect of authorizing the Federal Emergency Management Agency ("FEMA") to provide various forms of federal assistance to the State under the Stafford Act. *See* 42 U.S.C. §§ 5170-93. Under the CARES Act, Defendant U.S. Department of the Treasury has overseen disbursements to the State from the Coronavirus Relief Fund. *See* 42 U.S.C. § 801.

---

[10]  Although not applicable to the Plaintiffs in this case, some communities in Colorado are now subject to an even less restrictive set of protective measures dubbed "Protect Our Neighbors." *See* EO D 2020 127 (July 9, 2020), https://drive.google.com/file/d/16ELxn5fkAPQBlr4GX2 Jf24HVuCWaPcvn/view; EO D 2020 207 (Oct. 4, 2020), https://drive.goo gle.com/file/d/1jbrvv3M4cYi3UlSKiKe9Q9A2_348gLqs/view (extending EO D 2020 127 to Nov. 3, 2020).

[11]  *See also* EO D 2020 219 (Oct. 11, 2020), https://drive.google.com/file/ d/181os29EMCdptXc-XqqDAkUgTW-NvNTFv/view    (extending    EO D 2020 138 to Nov. 10, 2020).

Plaintiffs contend that the State Defendants issued their Executive Orders and Public Health Orders without legal authority and in violation of Plaintiffs' rights under the United States Constitution, the Colorado Constitution, the CDEA, and the Colorado Administrative Procedure Act ("APA"), Colo. Rev. Stat. §§ 24-4-101 to 204. They also contend that the State Defendants requested disaster relief funds from the federal government in violation of the Stafford Act. Finally, they contend that the Federal Defendants provided financial assistance to the State in violation of the Stafford Act and the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb to 2000bb-4.

## PRELIMINARY INJUNCTION STANDARD

"A preliminary injunction is an extraordinary remedy, the exception rather than the rule." *Mrs. Fields Franchising, LLC v. MFGPC*, 941 F.3d 1221, 1232 (10th Cir. 2019). One may be granted "only when the movant's right to relief is clear and unequivocal." *McDonnell v. City & Cty. of Denver*, 878 F.3d 1247, 1257 (10th Cir. 2018).

To succeed on a motion for preliminary injunction, the moving party must show: (1) that it is "substantially likely to succeed on the merits"; (2) that it will "suffer irreparable injury" if the court denies the injunction; (3) that its "threatened injury" without the injunction outweighs the opposing party's under the injunction; and (4) that the injunction is not "adverse to the public interest." *Mrs. Fields*, 941 F.3d at 1232; *accord Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The third and fourth preliminary-injunction factors "merge" when the government is the party opposing the injunction. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

If the injunction sought is of a "disfavored" type, the moving party faces a heavier burden and must make a "strong showing" that the first

and third factors weigh in its favor. *Mrs. Fields*, 941 F.3d at 1232. A disfavored preliminary injunction is one that: (1) mandates action (rather than prohibiting it); (2) changes the status quo; or (3) grants all the relief that the moving party could expect from a trial win. *Id.* Plaintiffs here seek a preliminary injunction of the third disfavored type. Their complaint seeks only declaratory and injunctive relief, and issuing their requested preliminary injunction would essentially grant them all the relief they could expect to win at trial. [*See* Compl., Doc. 1 at 34-35.] Plaintiffs must, therefore, make a strong showing on the likelihood-of-success-on-the-merits and balance-of-harms factors to succeed on their preliminary-injunction motion.[12]

## DISCUSSION

### I.   Likelihood of Success on the Merits

Plaintiffs seek a preliminary injunction based on nine of the eleven substantive causes of action alleged in their Complaint:

> (1) the Federal Defendants' implementation of the Stafford Act and the CARES Act violates RFRA (Claim 1);
>
> (2) the State Defendants' request for and the Federal Defendants' distribution of disaster relief funds to the State violates the Stafford Act's nondiscrimination mandate, 42 U.S.C. § 5151 (Claim 2);
>
> (3) the CDEA, both facially and as applied by the State Defendants through their Executive Orders and Public Health Orders, violates the Free Exercise Clause of the First Amendment to the federal Constitution (Claim 3);

---

[12] The Federal Defendants argue that the requested preliminary injunction is also disfavored because it would change the status quo. [Fed. Defs.' Resp., Doc. 43 at 8.] Having already found that the heightened disfavored-injunction standard applies, the court need not address that argument here.

(4) Governor Polis's Executive Orders violate the Free Exercise Clause of the First Amendment to the Colorado Constitution (Claim 4);

(5) Governor Polis issued his Executive Orders without making the disaster finding required by the CDEA (Claim 5);

(6) Governor Polis's Executive Orders exceed the scope of his authority under the CDEA (Claim 6);

(7) Governor Polis's Executive Orders are void for vagueness under the Fourteenth Amendment to the federal Constitution (Claim 9);

(8) Director Ryan's Public Health Orders are void for vagueness under the Fourteenth Amendment to the federal Constitution (Claim 10); and

(9) Director Ryan issued her Public Health Orders in violation of the Colorado APA and the Due Process Clause of the Fourteenth Amendment to the federal Constitution (Claim 11).

Of these claims, only the federal free exercise claim presents significant substantive issues. The court therefore addresses that claim first, followed by Plaintiffs' other federal constitutional claims, Plaintiffs' claims asserted under Colorado law, and finally Plaintiffs' federal statutory claims.

## A. First Amendment Free Exercise Claim Against State Defendants

Plaintiffs argue that Colorado has violated their constitutional right to free exercise of religion in two ways. First, they claim that the CDEA facially discriminates against religion. [Pls.' Mot., Doc. 13 at 17-19.]

Second, they contend that Public Health Order 20-35[13] discriminates against religious exercise by exempting certain secular organizations—but not houses of worship—from some of its requirements. [*Id.* at 19-20.] In this section, the court first addresses the framework for evaluating constitutional claims during an emergency like the ongoing pandemic. It then addresses the constitutionality of the CDEA and Public Health Order 20-35.

### 1.   Free Exercise in an Emergency

#### a.

The First Amendment to the Constitution, which has been incorporated against the states by the Fourteenth Amendment, guarantees, among other things, the free exercise of religion. U.S. Const. amend I; *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940). A state can violate this promise in a number of ways.

In the most obvious cases, a state violates the Free Exercise Clause by expressly discriminating against religion. This kind of discrimination is "odious to our Constitution" and calls for review under the "strictest scrutiny." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2019, 2025 (2017). A law that discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons must pass strict scrutiny review—*i.e.*, the law is invalid unless it is narrowly tailored to accomplish a compelling

---

[13] As noted above, *see supra* note 7, the Safer at Home order that was in place at the time Plaintiffs' motion was filed has since been replaced by Public Health Order 20-35. Both the earlier order and Public Health Order 20-35 contain similar restrictions on houses of worship and similar exemptions for certain secular institutions and activities. The orders do not differ meaningfully as they pertain to the court's analysis here.

interest. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531-33 (1993).

At the other end of the spectrum, there are neutral laws of general application that treat religious and secular institutions the same. A generally applicable law need not be narrowly tailored or justified by a compelling governmental interest, even if it has the incidental effect of burdening a particular religion or religious practice. *Emp. Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 878-82 (1990). A neutral law triggers strict scrutiny only if it burdens religious exercise and is motivated by animus toward religion. *Lukumi Babalu Aye*, 508 U.S. at 534, 546.

More subtly, a law might place certain categories of secular activities or institutions in a favored category, while placing religious activities or institutions in a less favorable category, such as by denying them exemptions or excluding them from beneficial treatment. *Id.* at 537, 542-46; *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 650 (10th Cir. 2006) ("When a law has secular exemptions, a challenge by a religious group becomes possible."). When a state begins exempting secular activities from an otherwise generally applicable regulation, it can only decline to exempt religious activities if it has a "compelling reason" and thus satisfies strict scrutiny. *Smith*, 494 U.S. at 884.

### b.

The wrinkle in this case, of course, is that it does not arise in "normal" times, but in the midst of a global pandemic. Emergencies like this one raise an age-old question. When confronting an emergency, to what extent can the government curtail civil rights? And what is the proper scope of judicial review of actions taken by state or federal governments in response to the emergency? Justice Jackson was surely correct that

the Bill of Rights is not a suicide pact—the Constitution doesn't kneecap a state's pandemic response. *See Terminiello v. City of Chicago*, 337 U.S. 1, 37 (1949) (Jackson, J., dissenting). But the existence of a crisis does not mean that the inalienable rights recognized in the Constitution become unenforceable. *Cf. Hamdi v. Rumsfeld*, 542 U.S. 507, 532 (2004) (plurality opinion) ("It is during our most challenging and uncertain moments that our Nation's commitment to due process is most severely tested; and it is in those times that we must preserve our commitment at home to the principles for which we fight abroad."). The question, then, is where to draw the line. How, if at all, does the normal analysis courts use to evaluate alleged constitutional violations change when the challenged government action was taken to combat a pandemic or other emergency threatening public health or safety?

The analysis changes in a number of ways. For one thing, there is no question that the State here has a compelling interest in protecting its citizens from the SARS-CoV-2 virus. *Jacobson v. Massachusetts*, 197 U.S. 11, 25 (1905) ("The police power of a state must be held to embrace, at least, such reasonable regulations established directly by legislative enactment as will protect the public health and the public safety."). For another thing, a state's actions during a public-health emergency, like Colorado's here, are often taken against a backdrop "fraught with medical and scientific uncertainties." *Marshall v. United States*, 414 U.S. 417, 427 (1974). It isn't the job of the judiciary to second-guess the "wisdom, need, or appropriateness" of the measures taken by a state to protect the health of its people during a pandemic. *Edwards v. California*, 314 U.S. 160, 173 (1941); *see also Jacobson*, 197 U.S. at 28, 30-35 ("It is no part of the function of a court . . . to determine [what is] likely to be the most effective for the protection of the public against disease.").

Colorado argues, however, that the Supreme Court's 115-year-old decision in *Jacobson* doesn't simply fit within the normal constitutional analysis or merely modify it to account for emergency circumstances. Colorado instead argues that this court's analysis begins and *essentially ends* with *Jacobson*. In *Jacobson*, the Supreme Court rejected a challenge to a mandatory vaccination law, holding that states have broad authority to implement emergency measures to protect "the safety and the health of the people," so long as those measures have some "real or substantial relation" to that objective and are not "beyond all question, a plain, palpable invasion of rights secured by the" Constitution. 197 U.S. at 31, 38. According to Colorado, the import of *Jacobson* is that courts should only intervene against state emergency action in "extreme cases," without applying modern constitutional doctrine. Essentially, the State's view is that, like the suspension of the writ of habeas corpus permitted by the Constitution in times of "Rebellion or Invasion," U.S. Const. art. I, § 9, cl. 2, normal constitutional review of state action is suspended when that action is taken to stop or slow a pandemic or other crisis. *See* Lindsay F. Wiley & Stephen I. Vladeck, *Coronavirus, Civil*

*Liberties, and the Courts: The Case Against "Suspending" Judicial Review*, 133 Harv. L. Rev. F. 179, 182 (2020).[14]

The court cannot accept the position that the Constitution and the rights it protects are somehow less important, or that the judicial branch should be less vigilant in enforcing them, simply because the government is responding to a national emergency. The judiciary's role may, in fact, be all the more important in such circumstances. *Cf. Trump v. Hawaii*, 138 S. Ct. 2392, 2423 (2018) ("*Korematsu* was gravely wrong the day it was decided, has been overruled in the court of history, and—to be clear—'has no place in law under the Constitution.'" (quoting *Korematsu v. United States*, 323 U.S. 214, 248 (1944) (Jackson, J., dissenting))). *Jacobson*, while an important and instructive case, isn't a "blank check for the exercise of governmental power." *Robinson v. Att'y Gen.*, 957 F.3d 1171, 1181 (11th Cir. 2020); *see also Calvary Chapel*, 140 S. Ct at 2605 (Alito, J., dissenting) ("[A] public health emergency does not give Governors and other public officials *carte blanche* to disregard the Constitution for as long as the medical problem persists."). Indeed, *Jacobson* itself says that "no rule prescribed by a state, nor any regulation adopted

---

[14]   Colorado argues that the Supreme Court recently affirmed this reading of *Jacobson* when the Court denied applications for injunctive relief from public-health orders issued by California and Nevada. *See S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (2020) (mem.); *Calvary Chapel Dayton Valley v. Sisolak*, 140 S. Ct. 2603 (2020) (mem.). But those decisions aren't precedential. *Cty. of Butler v. Wolf*, — F. Supp. 3d —, No. 2:20-CV-677, 2020 WL 5510690, at *7 n.9 (W.D. Pa. Sept. 14, 2020). And Colorado overlooks the fact that the Supreme Court applies a heightened standard when evaluating a request for injunctive relief that was denied at the District Court level. *S. Bay*, 140 S. Ct. at 1613 (Roberts, C.J., concurring) (Court "grants judicial intervention that has been withheld by lower courts" only "where the legal rights at issue are indisputably clear and, even then, sparingly and only in the most critical and exigent circumstances" (internal quotation marks omitted)).

by a local governmental agency acting under the sanction of state legislation" to safeguard public health and safety may "contravene the Constitution of the United States, nor infringe any right granted or secured by that instrument." 197 U.S. at 25. "A local enactment or regulation, even if based on the acknowledged police powers of a state, *must always* yield in case of conflict . . . with any right [the Constitution] gives or secures." *Id.* (emphasis added). And so, while the State can and must take action to respond to an emergency, it must do so within the confines of the Constitution.[15] In other words, while an emergency might provide justification to curtail certain civil rights, that justification must fit within the framework courts use to evaluate constitutional claims in non-emergent times.

### c.

So the better view is thus that *Jacobson* fits within existing constitutional doctrine. First, *Jacobson* means that most state and local public-health orders that don't implicate fundamental rights will be analyzed under what is now known as the rational basis test. And they will, as this court previously held, generally be upheld. *See Lawrence v.*

---

[15] *See, e.g.*, *Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610, 614-15 (6th Cir. 2020) (enjoining ban on drive-in church services); *Robinson*, 957 F.3d at 1181 (denying motion to stay district court's preliminary injunction of abortion restrictions); *Butler*, 2020 WL 5510690, at *8, *31 (applying traditional canons of constitutional review and declaring Pennsylvania's lockdown orders unconstitutional); *Tabernacle Baptist Church, Inc. of Nicholasville v. Beshear*, No. 3:20-CV-00033-GFVT, 2020 WL 2305307, at *4 (E.D. Ky. May 8, 2020) (enjoining prohibition on in-person religious services); *First Baptist Church v. Kelly*, No. 20-1102-JWB, 2020 WL 1910021, at *7 (D. Kan. Apr. 18, 2020) (enjoining ten-person limit on church services); *see also Bayley's Campground Inc. v. Mills*, No. 2:20-CV-00176-LEW, 2020 WL 2791797, at *10 (D. Me. May 29, 2020) (analyzing right-to-travel claim challenging Maine's fourteen-day quarantine under strict scrutiny).

*Colorado*, 455 F. Supp. 3d 1063, 1070-71, 1076-78 (D. Colo. 2020); *but see Butler*, 2020 WL 5510690, at *2 (declaring Pennsylvania's lockdown orders unconstitutional). Second, as noted above, even where heightened scrutiny does apply, *Jacobson* stands for the undeniable proposition that fighting a pandemic is a compelling state interest.

Third, and perhaps less obviously, *Jacobson*'s emphasis, in conjunction with cases like *Marshall* and *Edwards*, on the need for judicial deference to policymakers' analysis of evolving scientific and medical knowledge helps explain why, as "emergency" restrictions extend beyond the short-term into weeks and now months, courts may become more stringent in their review. In the court's view, this admonition comes into play in the "tailoring" prong of current constitutional doctrine. Where fundamental rights are implicated, this requires assessing whether the government's action is the least restrictive means available.

In the earliest days of a pandemic or other true emergency, what may be the least restrictive or invasive means of furthering a state's compelling interest in public health will be particularly uncertain, and thus judicial intervention should be rare. But as time passes, scientific uncertainty may decrease,[16] and officials' ability to tailor their restrictions more carefully will increase. *See Calvary Chapel*, 140 S. Ct at 2605 (Alito, J., dissenting) ("As more medical and scientific evidence becomes available, and as States have time to craft policies in light of that evidence, courts should expect policies that more carefully account for constitutional rights."); Michael W. McConnell & Max Raskin, Opinion, *If Liquor Stores Are Essential, Why Isn't Church?*, N.Y. Times

---

[16]   *See, e.g.*, Media Statement, Ctrs. for Disease Control & Prevention, *CDC Updates "How COVID is Spread" Webpage*, CDC Newsroom (Oct. 5, 2020), https://www.cdc.gov/media/releases/2020/s1005-how-spread-covd.html.

(Apr. 21, 2020), https://www.nytimes.com/2020/04/21/opinion/first-ame ndment-church-coronavirus.html ("In the early weeks of the crisis, it made sense to enforce sweeping closure rules against all public gatherings—no exceptions."). What may have been permissible at one point given exigencies and realistic alternatives in the face of those exigencies may not remain permissible in the long term. *Cf.* Wiley & Vladeck, *supra*, at 182 ("The suspension principle is inextricably linked with the idea that a crisis is of finite—and brief—duration. To that end, the principle is ill-suited for long-term and open-ended emergencies like the one in which we currently find ourselves.").

Applying normal constitutional scrutiny—even strict scrutiny, where appropriate—does not mean that the majority of actions taken by the State in response to the COVID-19 pandemic will be found invalid. As the remainder of this Order shows, "[m]any, probably even most, emergency measures will be upheld even under ordinary judicial review." Ilya Somin, *The Case for "Regular" Judicial Review of Coronavirus Emergency Policies*, Reason.com: The Volokh Conspiracy (Apr. 15, 2020), https://reason.com/2020/04/15/the-case-for-normal-judicial-review-of-co ronavirus-emergency-policies); *see also Butler*, 2020 WL 5510690, at *10 ("Using the normal levels of constitutional scrutiny in emergency circumstances does not prevent governments from taking extraordinary actions to face extraordinary situations. Indeed, an element of each level of scrutiny is assessing and weighing the purpose and circumstances of the government's act."). In light of "the severity of the threat, [emergency measures] can pass even a high level of scrutiny." Somin, *supra*. "But maintaining normal judicial review reduces the risk of pretextual policies, and helps ensure that even well-intentioned ones do not overreach." *Id.*; *see also Maryville Baptist Church*, 957 F.3d at 614-15 ("We don't doubt the Governor's sincerity in trying to do his level best to

lessen the spread of the virus or his authority to protect the Common-wealth's citizens."). A pandemic is, in other words, a context where con-stitutional scrutiny might be strict in theory, but not fatal in fact. *Cf. Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 237 (1995).

### 2. Colorado Disaster Emergency Act

The CDEA does not facially discriminate against religion. The CDEA was enacted to "reduce vulnerability of people and communities of [Col-orado] to damage, injury, and loss of life and property resulting from all-hazards, including natural catastrophes" such as epidemics. Colo. Rev. Stat. § 24-33.5-702(1)(a). To that end, the CDEA empowers the Colorado Governor to declare a disaster emergency and issue executive orders to combat natural and man-made disasters. *Id.* § 24-33.5-702(4). The stat-ute contains no provision that, on its face, discriminates against religion.

Plaintiffs, pointing to Section 24-33.5-702(2)(a)-(c), argue that the CDEA exempts certain secular institutions from its mandates and thus favors those institutions over religious institutions. [Pls.' Mot., Doc. 13 at 18.] The court disagrees. Section 24-33.5-702(2)(a) says that "nothing" in the Act "shall be construed to interfere with the course or conduct of a labor dispute." But that section expressly does not apply to actions "necessary to forestall or mitigate imminent or existing danger to public health or safety." *Id.* So the kind of actions at issue in this case aren't implicated by subsection (2)(a). Section 24-33.5-702(2)(b) says that "nothing" in the Act "shall be construed to interfere with dissemination of news or comment on public affairs." But this provision simply gives effect to the First Amendment's Free Speech Clause, which prohibits laws that infringe the right to speak. And section 24-33.5-702(2)(c) says that "nothing" in the Act "shall be construed to affect the jurisdiction or responsibilities of police forces, fire-fighting forces, or units of the armed

forces of the United States, or of any personnel thereof, when on active duty." But this, too, isn't an exemption from mandates of the Act, as much as an acknowledgement that, through the Act, the Governor doesn't come to control law enforcement or armed forces not within his purview.

Certainly, "a secular exemption [does not] automatically create[] a claim for a religious exemption." *Grace United*, 451 F.3d at 651. Rather, a fact-specific inquiry is required to determine whether the exemptions at issue, on their face or in practice, place religious exercise at a disadvantage. *Id.*; *see also Axson-Flynn v. Johnson*, 356 F.3d 1277, 1297-98 (10th Cir. 2004). The CDEA's exemptions do not do so, and so Plaintiffs are unlikely to succeed on the merits of their claim that the Act is facially unconstitutional.

### 3.   Public Health Order 20-35

Public Health Order 20-35 is a different matter. While the order designates houses of worship as "critical," in practice it treats them differently from other "critical" businesses and activities, even those that pose a comparable risk of COVID-19 transmission. Plaintiffs highlight two restrictions in the order that, they contend, are unconstitutionally applied to houses of worship and burden their right to free exercise: occupancy caps for indoor worship services, and the requirement that worshippers wear a face mask for indoor services.

As a preliminary matter, Plaintiffs have asserted that they have bona fide religious reasons for seeking to operate without additional capacity limits and for permitting worshippers to remove masks during services. The State has not challenged the sufficiency of Plaintiffs' showing in that regard, and so the court accepts as true that Plaintiffs' request for injunctive relief is driven by their religious rather than social

or other secular needs. Accordingly, the questions the court must consider are whether the secular exemptions in Public Health Order 20-35 are, in fact, discriminatory, and, if so, whether the State has a compelling reason for them.

**a.**

Many, if not most, of the mandates in Public Health Order 20-35 are neutral and generally applicable. For example, the six-foot distancing requirement for non-household members in public indoor spaces applies to houses of worship and secular institutions alike. It is not clear from Plaintiffs' motion whether they are challenging the six-foot distancing requirement or any of the other neutral and generally applicable parts of Public Health Order 20-35 under the federal Constitution. Plaintiffs argue that the six-foot distancing requirement violates their right to free exercise under the Colorado Constitution because it hinders their "preferred mode of worship," but nowhere in their motion do they make this argument with respect to the federal Constitution. [*Compare* Pls.' Mot., Doc. 13 at 22, *with id.* at 19-20.] Even assuming Plaintiffs do challenge the distancing requirement as part of their federal free exercise claim, that challenge would likely fail because the distancing requirement is neutral and generally applicable, and thus likely constitutional under *Smith*.

Other parts of Public Health Order 20-35, by contrast, are not generally applicable—namely the occupancy limits imposed on houses of worship and the face-mask mandate challenged by Plaintiffs.

Under the current Public Health Order, at Level 1 of the Safer at Home Levels, houses of worship "may operate at 50% of the posted occupancy limit indoors not to exceed 175 people." 2d Am. PHO 20-35, *supra* note 7, § II(B)(2)(j), at 5. At Level 2, houses of worship "may operate

at 50% of the posted occupancy limit indoors not to exceed 50 people." *Id.* § II(C)(2)(j), at 7. And at Level 3, they "may operate at 25% of the posted occupancy limit indoors not to exceed 50 people." *Id.* § II(D)(2)(j), at 9. Even though many secular institutions designated as "non-critical" are also required to comply with the same or similar occupancy limitations, Public Health Order 20-35 creates exemptions for a wide swath of secular institutions deemed "critical," including: meat-packing plants, distribution warehouses, P-12 schools, grocery stores, liquor stores, marijuana dispensaries, and firearms stores. *Id.* app. A at 27-31. In other words, the JBS meat-packing plant in Greeley, the Amazon warehouses in Colorado Springs and Thornton, and your local Home Depot, Walmart, King Soopers, and marijuana shop are not under any additional occupancy limitation other than the six-foot distancing requirement. Denver Bible Church and Community Baptist Church, by contrast, must comply with numerical occupancy caps, no matter how many people their sanctuaries might accommodate while maintaining six feet of distance between non-household members.[17]

Consider as well the face-mask mandate in Executive Order D 2020 138, which is incorporated by reference into to Public Health Order 20-35. It generally requires persons older than ten to wear a face covering when inside a Public Indoor Space, which includes houses of worship. [*See* EO D 2020 138, Doc. 1-15 at 2, 4.] Yet, for example,

---

[17]   Under Public Health Order 20-35, it isn't clear that eliminating the current numerical occupancy caps will have an effect on Plaintiffs' ability to welcome more worshippers so long as the neutral and generally applicable social-distancing rule stays in place. [*See* Resp. to State Defs.' Suppl. Br., Doc. 56 at 2.] But given the facially disparate capacity limitations applied to houses of worship and the constantly changing nature of the Public Health Orders, Plaintiffs are under a legitimate threat of discriminatory treatment should the State reduce the occupancy caps in a future order or amendment.

"individuals who are seated at a food service establishment" are exempt from the face-mask requirement. [*Id.* at 3.] "Individuals who are receiving a personal service where the temporary removal of the face covering is necessary to perform the service" are also exempt, as are "Individuals who are exercising alone or with others from the individual's household and a face covering would interfere with the activity." [*Id.*] Executive Order D 2020 138 contains a total of eight exemptions, none of which apply to worship services. [*Id.*]

By the orders' terms and in effect, what this system of limitations and exemptions has done is to both ease restrictions on what the State deems critical, and to some extent noncritical, activities, and to remove particular restraints, like the face-mask requirement, when those restraints would interfere with what the State considers a "necessary" part of the activity. The State may have the power in general to decide what activities are and are not critical to ensure the health and safety of individuals and their households, and what tasks are necessary to carry out secular activities. But it does not have the power to decide what tasks are a necessary part of an individual's religious worship. And while religious exercise is subject to truly neutral and generally applicable regulations, once the State begins creating exceptions for secular activities as it deems necessary, then it is obligated to treat religious activities no less favorably, absent a compelling reason.

The State Defendants argue that these exemptions aren't actually treating houses of worship less favorably than secular institutions. But the fact is that Public Health Order 20-35 explicitly imposes on houses of worship limits that do not apply to other so-called "critical" businesses. And Executive Order D 2020 138 likewise provides various exemptions from the face-mask requirement that do not apply to houses of worship, even those who might view removing a mask as necessary to

their religious practice. So it is clear that the State's orders treat religious institutions less favorably than some secular institutions.

### b.

The State Defendants offer three reasons for their disparate treatment of houses of worship. None is compelling.

Colorado first justifies its discriminatory treatment of houses of worship on the ground that contact tracing is easier in houses of worship than in the kinds of retail settings that are exempt from the more onerous occupancy limits in Public Health Order 20-35: "It is also practically impossible to perform contact tracing between strangers who have anonymous interactions in a critical retail setting." [Suppl. Herlihy Decl., Doc. 50-1 at ¶ 72.] Far from helping Colorado, this argument cuts strongly against it. That it is easier to use contact tracing in houses of worship than in other settings doesn't justify worse treatment of houses of worship—just the opposite. If anything, the relative ease of contact tracing at houses of worship justifies fewer restrictions, and concomitantly more restrictions on institutions where contact tracing is more difficult.

Next, Colorado says that its decision not to impose occupancy restrictions on schools reflects its respect for the principle of local control of school districts enshrined in Colorado's Constitution. [State Defs.' Suppl. Br., Doc. 50 at 5 (citing Colo. Const. art. IX, §§ 1, 15).] This respect is well-placed. Local control is indeed an important concept in Colorado's Constitution. But it is not more important than the principles enshrined in the First Amendment to the United States Constitution. And if Colorado is willing to run additional risks out of respect for local school districts' autonomy, the First Amendment requires it to do the same out of respect for religious congregations' autonomy. *See Trinity*

*Lutheran*, 137 S. Ct. at 2025 (differential treatment of religious institutions is "odious" to the Constitution).

The State's strongest reason for treating houses of worship differently is that, in most of the secular institutions exempted from the occupancy and other limitations, indoor person-to-person contact is "transient," whereas person-to-person contact in a church setting is generally prolonged. [State Defs.' Suppl. Br., Doc. 50 at 4.] The State Epidemiologist, Dr. Rachel Herlihy, testified that "in closed-indoor environments, respiratory droplets are more likely to linger on surfaces and/or be recirculated through the indoor space due to either poor ventilation or large numbers of people in the indoor space." [Suppl. Herlihy Decl., Doc. 50-1 at ¶ 31.] According to Dr. Herlihy, "short, transient interactions" indoors are much less likely to transmit COVID-19 than extended indoor contact is. [*Id.* at ¶¶ 30, 71.]

While the court accepts these facts as true, Colorado's transient-versus-prolonged approach to differential treatment of houses of worship is flawed. The State's evidence regarding what constitutes a "close"—and thus dangerous—contact requires both a proximity *and* a duration component. According to Dr. Herlihy, "data are insufficient to precisely define the duration of exposure that constitutes prolonged exposure and thus a close contact. However, a close contact is defined as being within 6 feet for at least a period of 15 minutes to 30 minutes or more depending upon the exposure." [*Id.* at ¶ 26.] So according to the State's own evidence, for a contact to be "close" and thus significantly riskier, it must (1) be within six feet *and* (2) last for more than fifteen minutes. If so, a limit on either proximity or duration is adequate to avoid risky close contacts. And under the Distancing Requirements of Public Health Order 20-35, no entity open to the public, including houses of worship, may allow non-household person-to-person contact indoors within six feet. So

even without an occupancy restriction, Plaintiffs are subject to a regulation that prevents one of the two necessary components of a risky close contact. That, according to the State's own evidence, ought to be enough. And, for most other critical businesses, it is: warehouses, schools, critical manufacturing, groceries, pharmacies, liquor stores, and others are allowed to operate at full capacity for presumably full shifts of well over an hour, on the assumption that the distancing restrictions will be adequate to protect against virus transmission.[18]

The more serious problem is that Public Health Order 20-35 exempts secular settings that pose similar threats of prolonged exposure from the occupancy limitations and face-mask requirements imposed on houses of worship. What is the meaningful difference between, say, a warehouse, a restaurant, or an elementary school—where employees, diners, and students spend long periods in a closed-indoor setting—and a house of worship? The best answer Colorado has is that "singing or speaking loudly propels respiratory droplets farther," and that this kind of activity happens in houses of worship but not in those other settings. [*Id.* at ¶¶ 29, 38.] Dr. Herlihy likewise generalizes that "customs in houses of worship may also result in increased contact. For example, shaking hands, observing Eucharist, passing a basket, or showing a sign of the peace may all place people in closer contact th[a]n they would be in other settings." [Herlihy Decl., Doc. 41-1 at ¶ 57.] Perhaps. But shaking hands, passing items around, and showing a sign of peace have secular

---

[18]  To the extent that the six-foot distancing requirement is contested here, *see supra* Discussion, Section 0(A)(3)(a), p. 21, Plaintiffs and their congregants must abide by it, to the greatest extent possible, as must all Critical Businesses. So long as they do, the additional occupancy limits imposed on houses of worship don't serve to combat the kind of prolonged, close exposure that, according to the State's own evidence, is most dangerous.

equivalents in many places of business or social settings. And as Dr. Herlihy admits, schools "also frequently have singing or loud, excited speaking." [Suppl. Herlihy Decl., Doc. 50-1 at ¶ 44.] Indeed, most outbreaks in Colorado have occurred at workplaces, schools, and businesses, not churches.[19] The largest outbreaks in the State have been at colleges and prisons.[20] And the State's own data show that, of the nearly 900 active and resolved outbreaks Colorado has seen to date, only fifteen of those (less than 2%) occurred at a religious facility.[21] In the end, though, the court does not doubt the science underlying Colorado's decisions. It accepts that the best available evidence says transmission of COVID-19 is more likely indoors when people are together for long periods of time.

But the orders reveal that in practice the State treats some activities as necessary, but those Plaintiffs seek to engage in as less so. This reflects the view that, as one court put it, it is practically impossible to restrict people from working together in person in places like schools, food-processing facilities, restaurants, and warehouses, but "churches can feed the spirit in other ways." *See Elim Romanian Pentecostal Church v. Pritzker*, 962 F.3d 341, 347 (7th Cir. 2020) (Easterbrook, J.). That may be true for many religious individuals and institutions, but it is not for Plaintiffs. And with due respect for both the State and the

---

[19] DJ Summers, *Colorado's Outbreaks Come More from the Workplace than Elsewhere*, FOX31 Denver & Colorado's Own Channel 2 News (Oct. 9, 2020), https://kdvr.com/news/coronavirus/colorados-outbreaks-come-more-from-the-workplace-than-elsewhere.

[20] Meg Wingerter, *State Has 274 Active Outbreaks*, Denver Post, Oct. 15, 2020, at 2A, https://www.denverpost.com/2020/10/15/colorado-covid-outbreaks-record.

[21] CDPHE, *Outbreak Data: COVID-19 OB Weekly Report 10 14 2020 (rev2)*, Colo. COVID-19 Updates (Oct. 14, 2020), https://drive.google.com/drive/u/0/folders/1ELmTGWgtj-xPhcTXy-k-526G7l9fC1vs.

Seventh Circuit, this court does not believe government officials in any branch have the power to tell churches and congregants what is necessary to feed their spiritual needs.[22] *See Maryville Baptist Church*, 957 F.3d at 615 (state is not entitled to decide whether reduced, masked congregation or online services are "an adequate substitute for what it means when 'two or three gather in my Name.'" (quoting Matthew 18:20)).

### c.

Plaintiffs are likely to succeed on the merits of their free exercise claim for a simple reason. Having decided that the risk of allowing various activities to be exempt from the strictest Safer at Home rules is justified on the basis that those activities are critical and necessary, the State cannot decide for Plaintiffs what is critical and necessary to their religious exercise. With each exception Colorado makes for secular institutions, the failure to make the same exemption for houses of worship becomes increasingly problematic. As time passes, and Colorado learns more about the science of COVID-19, its public-health officials have made carefully tuned risk assessments about what activities they deem sufficiently important to warrant full-capacity reopening. These choices clarify what activities they believe serve societal interests of the highest

---

[22]   There is no evidence that Colorado, in treating houses of worship differently than other businesses, was motivated by religious animus or bigotry. To the contrary, the court is convinced that all the Defendants have acted in good faith. More likely this is a manifestation of a legal culture that, as Judge Pryor has noted in a different context, "often struggles to understand religious practice or to take religious perspectives seriously." *United States v. Brown*, 947 F.3d 655, 706 (11th Cir. 2020) (William Pryor, J., dissenting) (citing Stephen L. Carter, *The Culture of Disbelief: How American Law and Politics Trivialize Religious Devotion* (1993); Richard John Neuhaus, *The Naked Public Square: Religion and Democracy in America* (1984)).

order—primary and secondary education, convenient access to food and home supplies, and certain kinds of manufacturing. These *are* important interests—critical and necessary even. But the People, through the Constitution, have resolved that the free exercise of religion is at least as critical and necessary. So Colorado's failure to offer a compelling reason why houses of worship are subject to greater restrictions than warehouses, schools, and restaurants violates the First Amendment's guarantee of the free exercise of religion. Plaintiffs have thus made a strong showing that they are likely to succeed on the merits of their as-applied free exercise claim.

Note well that the implications of this conclusion aren't as broad as some might hope or others might fear. Plaintiffs will still be subject to the neutrally applicable rules and prohibitions in Public Health Order 20-35. They will, for example, have to enforce sanitization requirements, maintain social distancing between individuals, and not permit shaking hands. *See, e.g.*, 2d Am. PHO 20-35, *supra* note 7, § IV(D), at 21. All in all, based on their bona fide religious need to do so, Plaintiffs will be allowed to open their sanctuaries subject to the same capacity, social distancing, and masking rules that are applicable to other critical businesses, and will be able to permit congregants to remove their masks if and when it is necessary to carry out their religious exercise.

## B. Fourteenth Amendment Vagueness Claims Against Governor Polis and Director Ryan

Plaintiffs contend that Governor Polis's Executive Orders and Director Ryan's Public Health Orders are unconstitutionally vague. [Pls.' Mot., Doc. 13 at 27-31.] The court is sympathetic to Plaintiffs' frustration at the number of Executive Orders and Public Health Orders that have been issued since the pandemic began, and at the density and length of those orders. And as noted above, the frequent issuance of amendments

and superseding orders can create a moving target when attempting to determine which restrictions are or were in effect at a given moment in time. On the other hand, the court recognizes that the frequent amendments and updates to the orders reflect the State Defendants' efforts to refine the orders as new information becomes available regarding the ways in which COVID-19 spreads and as infection rates fluctuate throughout the State. Ultimately, Plaintiffs have not identified any aspect or provision of the various Executive Orders and Public Health Orders that would cause a person of ordinary intelligence, after a careful and thorough reading of the orders, to be unable to discern what behavior is mandated or prohibited. Plaintiffs are therefore unlikely to succeed on the merits of their vagueness claims.

A law is impermissibly vague if "a person of common intelligence cannot discern what conduct is prohibited, required, or tolerated." *Mini Spas, Inc. v. S. Salt Lake City Corp.*, 810 F.2d 939, 942 (10th Cir. 1987). But "perfect clarity and precise guidance" are not required. *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989) (citing *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972) ("Condemned to the use of words, we can never expect mathematical certainty in our language.")). A law is not vague merely because it "requires a person to conform his conduct to an imprecise but comprehensible normative standard"; but it is unconstitutionally vague if "no standard of conduct is specified at all." *Coates v. Cincinnati*, 402 U.S. 611, 614 (1971).

### 1.   Governor Polis's Executive Orders

Plaintiffs assert that Governor Polis's Executive Orders are "inherently unclear." [Pls.' Mot., Doc. 13 at 28.] But other than criticizing the number and length of the orders and the frequency with which they have been issued and amended, Plaintiffs identify only two alleged

deficiencies in the Executive Orders: (1) the orders cross-reference other Executive Orders and Public Health Orders "that are currently in effect" without specifying which Executive Orders and Public Health Orders are currently in effect; and (2) Executive Order D 2020 138 [Doc. 1-15], which orders individuals to wear face masks, does not define the term "appropriate under industry standards." [Pls.' Mot., Doc. 13 at 28.]

The fact that the Executive Orders incorporate other Executive Orders and Public Health Orders by reference may make it difficult to follow the entirety of the State's restrictions, but that is hardly unique in modern law, and it does not render the orders unconstitutionally vague. *United States v. Collins*, 461 F. App'x 807, 809 (10th Cir. 2012) (citing *Hines v. Baker*, 422 F.2d 1002, 1005 (10th Cir. 1970) ("[I]ncorporation by reference to other defined offenses is not impermissibly vague.")). And, as the State Defendants point out, each of their Executive Orders and Public Health Orders clearly states its effective period. *See, e.g.*, [EO D 2020 138, Doc. 1-15 at 4 ("Executive Order D 2020 039 . . . as amended and extended by . . . this Executive Order, shall expire thirty (30) days from July 16, 2020, unless extended further by Executive Order.")]; 2d Am. PHO 20-35, *supra* note 7, § VIII, at 26 ("This Order shall become effective on Thursday, October 8, 2020 and will expire 30 days from October 6, 2020, unless extended, rescinded, superseded, or amended in writing."). This then, is not a basis for finding the Executive Orders unconstitutionally vague, as a person of ordinary intelligence can, with a little effort, discern the effective dates of the various orders.

As to Plaintiffs' second objection, the phrase "appropriate under industry standards" in Executive Order D 2020 138 is, in context, comprehensible to a person of ordinary intelligence. Executive Order D 2020 138 requires Coloradans to wear a non-medical face covering

over their nose and mouth, subject to certain exceptions, and further provides that "Nothing in this Executive Order should be construed to prevent individuals from wearing a surgical-grade mask or other, more protective face covering to cover the nose and mouth if that type of mask or more protective face covering is *appropriate under industry standards*." [Doc. 1-15 at 2, 3 (emphasis added).] A person of ordinary intelligence would understand that the phrase "appropriate under industry standards" is meant to clarify that the Executive Order's general mandate to wear a non-medical face covering does not prevent those working in industries where a more protective covering is necessary from wearing the type of face covering that is appropriate for their industry, *e.g.*, health-care workers may wear medical-grade masks. *See Coates*, 402 U.S. at 614 ("comprehensible normative standard[s]" are not impermissibly vague); *Boos v. Barry*, 485 U.S. 312, 332 (1988) (undefined word or phrase does not render law vague when its meaning is ascertainable in context).

Since Plaintiffs have not identified any other specific deficiencies in the Executive Orders,[23] they are not likely to succeed on the merits of their vagueness claim against Governor Polis.

---

[23]   Plaintiffs argue for the first time in their reply brief that certain provisions of Executive Order D 2020 017 [Ex. 11 to Compl., Doc. 1-11] are impermissibly vague. [*See* Pls.' Reply to State Defs.' Resp., Doc. 45 at 8-9.] The court need not consider arguments raised for the first time in a reply brief. *Sadeghi v. I.N.S.*, 40 F.3d 1139, 1143 (10th Cir. 1994). The court has, nonetheless, reviewed the identified provisions of Executive Order D 2020 017 and similarly finds that the order sufficiently apprises a person of ordinary intelligence as to what behavior is mandated and prohibited.

## 2. Director Ryan's Public Health Orders

In addition to their general complaint about the number, length, and frequency of issuance of Director Ryan's Public Health Orders, Plaintiffs identify several specific deficiencies that they contend render the orders void for vagueness. [*See* Pls.' Mot., Doc. 13 at 28-31.] None of these alleged deficiencies renders the orders insufficiently comprehensible to a person of ordinary intelligence.

Plaintiffs first contend that the numbering of Public Health Order 20-28 [9th Am. PHO 20-28, Doc. 1-41] and other Public Health Orders is misleading because Director Ryan often issues "Amended" Public Health Orders with the same number rather than a superseding Public Health Order with a new number. This fact does not render the orders unconstitutionally confusing. Each amendment to Public Health Order 20-28 clearly identifies the number of the amendment and the date it issued. [*See* PHO 20-28, Ex. 26 to Compl., Doc. 1-26; Am. PHO 20-28, Ex. 27 to Compl., Doc. 1-27; 2d Am. PHO 20-28, Ex. 28 to Compl., Doc. 1-28; 3d Am. PHO 20-28, Ex. 29 to Compl., Doc. 1-29; 4th Am. PHO 20-28, Ex. 30 to Compl., Doc. 1-30; 5th Am. PHO 20-28, Ex. 31 to Compl., Doc. 1-31; 6th Am. PHO 20-28, Ex. 32 to Compl., Doc. 1-32; 7th Am. PHO 20-28, Ex. 33 to Compl., Doc. 1-33; 8th Am. PHO 20-28, Ex. 34 to Compl., Doc. 1-34; 9th Am. PHO 20-28, Doc. 1-41; 10th Am. PHO 20-28, Ex. 8 to Pls.' Reply to State Defs.' Resp., Doc. 45-8.] While it might be helpful if each amended version of the various Public Health Orders highlighted the specific provisions that were amended in that version, it is not constitutionally required.

Plaintiffs next contend that the titles of Public Health Order 20-23 [Am. PHO 20-23, Ex. 20 to Compl., Doc. 1-20] and Public Health Order 20-28 [6th Am. PHO 20-28, Doc. 1-32] do not fairly describe the

orders' content. But Plaintiffs cite to no authority in support of the proposition that the title of a law alone can render it unconstitutionally vague where the actual substance of the law is sufficiently comprehensible to a person of ordinary intelligence. And even if that were the case, the title of Public Health Order 20-23, *i.e.*, "Implementing Social Distancing Measures," is directly related to the order's content, which limits the number of people who may gather socially in one space. Likewise, the title of Public Health Order 20-28, *i.e.*, "Safer at Home and in the Vast, Great, Outdoors," is directly related to the order's content, which implements the set of protective measures directed by Governor Polis's Safer at Home Executive Order.

As to the substance of Director Ryan's orders, Plaintiffs argue that Public Health Order 20-23 [Doc. 1-20] is vague because it does not define the phrases "the community hosting the event" or "strain the planning and response resources" in the context of defining what constitutes a "mass gathering." Public Health Order 20-23 limits "mass gatherings" to no more than ten people. [*Id.* at 1.] The order notes that the CDC defines a "mass gathering" as "a planned or spontaneous event with a large number of people in attendance that *could strain the planning and response resources* of the *community hosting the event*, such as a concert, festival, conference, or sporting event." [*Id.* at 2 (emphasis added).] The order further specifies that

> Gatherings subject to this Order include, but are not limited to, community, civic, public, leisure, faith-based events, sporting events with spectators, concerts, conventions, fundraisers, parades, fairs, festivals, and any similar event or activity that brings together (10) or more persons in a single room or space at the same time in a venue such as an auditorium, stadium, arena, large conference room, meeting hall, private club, or any other confined indoor or outdoor space.

[*Id.* at 3.] Though the order does not define the phrase "strain the planning and response resources of the community hosting the event," the court is of the opinion that this phrase is understandable to an ordinary person. And in any case, the order is sufficiently detailed that an ordinary person can understand what conduct is prohibited—namely, gatherings that "bring[] together (10) or more persons in a single . . . confined indoor or outdoor space."

Plaintiffs argue that the substance of Public Health Order 20-28 [6th Am. PHO 20-28, Doc. 1-32; 8th Am. PHO 20-28, Doc. 1-34] is vague because (1) the order contains a confusing mix of mandatory and permissive language; (2) the order incorporates additional CDPHE guidelines by reference via hyperlink; and (3) the order does not define the "appropriate local authority" from which houses of worship must obtain approval to hold outdoor services. The mix of mandatory and permissive language does not make Public Health Order 20-28 impermissibly vague. It is not difficult for a person of ordinary intelligence to understand that certain behavior, *e.g.*, implementing electronic platforms to conduct worship services, is encouraged but not required, while other behavior, *e.g.*, maintaining six feet of distance between non-household members, is required. Nor does the incorporation by reference of other permissive guidelines render the order vague. *Collins*, 461 F. App'x at 809. And finally, the fact that the order does not define the phrase "appropriate local authority" does not make the order vague. A person of ordinary intelligence would understand that the various local municipalities throughout the State may each have their own requirements and procedures for obtaining permission to hold outdoor worship

services.[24] Public Health Order 20-28 is sufficiently clear that an ordinary person can understand what conduct is mandated and prohibited.[25]

Plaintiffs are not likely to succeed on the merits of their vagueness claim against Director Ryan.

## C. Fourteenth Amendment Due Process Claim Against Director Ryan

Plaintiffs contend that the Fourteenth Amendment entitled them to procedural due process—notice and a hearing—before Director Ryan issued her Public Health Orders. [Pls.' Mot., Doc. 13 at 31.] But procedural due process in the form of individual notice and hearing is typically not required for the government to implement a generally applicable rule that affects the public at large, rather than a specific individual or a small group. *See Onyx Props. LLC v. Bd. of Cty. Comm'rs of Elbert Cty.*, 838 F.3d 1039, 1044-49 (10th Cir. 2016). Even if it normally were required, summary action, without notice and a hearing, may be justified

---

[24]  Plaintiffs also argue that Public Health Order 20-28 gives local authorities "unbridled discretion" to approve, or not, any request by Plaintiffs to hold outdoor services. [Pls.' Mot., Doc. 13 at 30.] But the order does not purport to give those local entities any authority they don't already have by virtue of state or local law; it simply allows them to exercise that authority in these circumstances. To the extent that any Colorado municipality requires a permit to hold outdoor worship services without adequately defining the standards by which such permits are granted or denied, Plaintiffs must address that complaint to the municipality at issue, not to Director Ryan.

[25]  Plaintiffs argue for the first time in their reply brief that certain provisions of Public Health Order 20-24 [4th Am. PHO 20-24, Ex. 25 to Compl., Doc. 1-25] are impermissibly vague. [*See* Pls.' Reply to State Defs.' Resp., Doc. 45 at 8-9.] As noted, the court need not consider arguments raised for the first time in a reply brief. *Sadeghi*, 40 F.3d at 1143. But the court has reviewed the identified provisions, and finds that Public Health Order 20-24 sufficiently apprises a person of ordinary intelligence as to what behavior is mandated and prohibited.

in emergency situations, and "[p]rotection of the health and safety of the public is a paramount governmental interest which justifies" such action. *Hodel v. Va. Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264, 299-301 (1981). This procedural argument is more aptly addressed under the Colorado APA, but any violation of state procedural requirements, to the extent one occurred, does not in itself amount to a denial of federal constitutional due process.[26] *Onyx Props.*, 838 F.3d at 1044.

For these reasons, Plaintiffs are not likely to succeed on the merits of their Fourteenth Amendment procedural due process claim.

### D. State Law Claims Against State Defendants

Plaintiffs' claims that Governor Polis issued his Executive Orders in violation of the Colorado Constitution and the CDEA, and that Director Ryan issued her Public Health Orders in violation of the Colorado APA are likely barred by the Eleventh Amendment to the federal Constitution.

The Eleventh Amendment provides that the power of federal courts "shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State." U.S. Const. amend. XI. The Eleventh Amendment bars suits in federal court against a State brought not only by "Citizens of another State" but also by the State's own citizens. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98 (1984) (citing *Ex parte New York No. 1*, 256 U.S. 490, 497 (1921)). Where a plaintiff nominally sues only state officials, the Eleventh Amendment bars suit if the State "is the real,

---

[26]  As noted below, the Eleventh Amendment bars this court from adjudicating Plaintiffs' claim that Director Ryan violated the Colorado APA. *See infra* Discussion, Section 0(D), pp. 37-38.

substantial party in interest" and "regardless of whether the suit seeks damages or injunctive relief." *Id.* at 101-02. An exception to the application of Eleventh Amendment immunity to suits against state officials applies to suits seeking prospective relief for violations of federal law. *Id.* at 102 (citing *Ex parte Young*, 209 U.S. 123, 160 (1908)). But this exception does not extend to suits against state officials seeking prospective relief for state-law violations:

> In such a case the entire basis for the doctrine of *Young* . . . disappears. A federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law. On the contrary, it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment.

*Id.*

Here, Plaintiffs bring several claims seeking declaratory and injunctive relief against the State Defendants for alleged violations of state law—the Colorado Constitution, the CDEA, and the Colorado APA. Plaintiffs appear to argue that these claims are asserted against State officials rather than the State itself, in an attempt to invoke the *Young* exception. [*See* Pls.' Mot., Doc. 13 at 2-3; Pls.' Reply to State Defs.' Resp., Doc. 45 at 5; Compl., Doc. 1 at 1-2.] But even if that were so, it is irrelevant under the federalism principles described in *Pennhurst*, which bar federal courts from enjoining state officials' actions under state law. 465 U.S. at 102 (noting that the "entire basis" for the *Young* exception "disappears" in that context). The Eleventh Amendment thus likely precludes this court's adjudication of Plaintiffs' claims alleging violations of state law, making Plaintiffs unlikely to succeed on the merits of those claims.

### E.   Federal Statutory Claims Against Federal Defendants

Plaintiffs contend that the Federal Defendants violated RFRA by distributing disaster relief to the State pursuant to the CARES Act and the Stafford Act. [Pls.' Mot., Doc. 13 at 9-13.] They further contend that the Federal Defendants, by distributing aid under the Stafford Act, violated the Stafford Act itself. [*Id.* at 13-17.]

RFRA prohibits the federal government from substantially burdening a person's exercise of religion—even if the burden results from a neutral law of general applicability—except in furtherance of a compelling governmental interest that is the least restrictive means of furthering that interest. 42 U.S.C. §§ 2000bb-1, 2000bb-3. The Stafford Act provides a framework by which the President can declare national emergencies and major disasters, thereby authorizing FEMA to provide federal assistance to the affected regions. *See* 42 U.S.C. §§ 5121-5207. The Stafford Act requires that "the distribution of supplies, the processing of applications, and other relief and assistance activities shall be accomplished in an equitable and impartial manner, without discrimination on the ground[] of . . . religion." 42 U.S.C. § 5151(a); *see also* 44 C.F.R. § 206.11.

Plaintiffs' claims appear to be that the Federal Defendants violated both RFRA's prohibition on burdening free exercise and the Stafford Act's nondiscrimination mandate by distributing Stafford Act and/or CARES Act funds to a state that had issued emergency orders that discriminate on the basis of religion. Plaintiffs seek injunctive relief prohibiting the Federal Defendants from providing future aid to the State under the Stafford Act, the CARES Act, "or similar federal law" so long

as the State's discriminatory orders remain in effect.[27] [Compl., Doc. 1 at 35.] The Federal Defendants respond that Plaintiffs lack standing to bring these claims. [Fed. Defs.' Resp., Doc. 43 at 10-15.] The court agrees.

To invoke the court's jurisdiction, a plaintiff must demonstrate, at an "irreducible minimum," that: (1) he has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant; (2) the injury is traceable to the challenged conduct; and (3) the injury is likely to be redressed if the requested relief is granted. *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982).

For purposes of this preliminary-injunction motion, the Federal Defendants appear to concede that the Plaintiffs have alleged an injury in fact. [Fed. Defs.' Resp., Doc. 43 at 10.] But they argue that (1) Plaintiffs' injuries are not traceable to the Federal Defendants' conduct, and (2) the remedy Plaintiffs seek would not redress their injuries.

Plaintiffs' alleged injury is the deprivation of their ability to freely practice their religion due to the restrictions imposed by the State Defendants' Executive Orders and Public Health Orders. On traceability, Plaintiffs argue that "State Defendants would not have deprived

---

[27]   Plaintiffs also contend that the State Defendants violated the Stafford Act by requesting federal aid under that Act, but Plaintiffs do not appear to seek preliminary injunctive relief against the State Defendants on the basis of this claim. The court therefore addresses Plaintiffs' federal statutory claims here only as against the Federal Defendants. In any case, Plaintiffs likely lack standing to pursue a Stafford Act claim seeking injunctive relief against the State Defendants for similar reasons discussed in this section with respect to their claims against the Federal Defendants. Namely, barring the State from receiving federal aid would not directly redress Plaintiffs' alleged injuries.

Plaintiffs of their rights absent approval and assistance by Federal Defendants." [Compl., Doc. 1 at ¶ 124.] But nothing in the record indicates that any action by the Federal Defendants caused or induced the State Defendants to issue the challenged public-health orders. The State Defendants issued several Executive Orders and Public Health Orders *before* receiving any federal disaster funds; the preliminary-injunction evidence does not show that the Federal Defendants conditioned their approval or distribution of aid on the issuance of orders that mandate limits on gatherings, mask wearing, or social distancing; nor does the evidence show that the State's receipt of federal funds prompted Governor Polis or Director Ryan to issue or keep in place such orders. Because Plaintiffs have failed to establish a non-tenuous connection between their injuries and the Federal Defendants' conduct, they likely cannot establish traceability.

Plaintiffs fare no better on redressability. The Federal Defendants argue persuasively that the relief Plaintiffs seek—an injunction against future federal aid—would not cure Plaintiffs' injuries. [*See* Fed. Defs.' Resp., Doc. 43 at 14-15.] Plaintiffs have not shown that an injunction against future federal aid would lead Colorado to rescind any unlawful Executive Orders or Public Health Orders—the direct cause of Plaintiffs' injuries. To be sure, if future aid was conditioned on rescission of the discriminatory aspects of the challenged public-health orders, the State may well be persuaded to comply. But only the State Defendants—not the Federal Defendants—can actually rescind or amend those orders. Because enjoining the Federal Defendants from distributing aid would not itself cure Plaintiffs' injuries, Plaintiffs likely cannot establish redressability.

Because Plaintiffs likely do not have standing with respect to their statutory claims for injunctive relief against the Federal Defendants, they are unlikely to succeed on the merits of those claims.

## II.  Irreparable Injury

Plaintiffs have established irreparable harm. Where, as here, a movant demonstrates he is likely to establish a violation of his right to free exercise, he has necessarily established irreparable harm. *See Hobby Lobby Stores v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013) ("[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."), *aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014). That there was a slight delay by Plaintiffs in filing this suit doesn't change this conclusion. "It is true that 'delay in seeking preliminary relief cuts against finding irreparable injury.'" *Fish v. Kobach*, 840 F.3d 710, 753 (10th Cir. 2016). But "delay is only one factor to be considered among others, and there is no categorical rule that delay bars the issuance of an injunction." *Id.* (citation omitted). And here, Plaintiffs' delay in seeking relief more likely reflects the principle discussed above that what the Constitution requires was less demanding at the outset of the pandemic.

## III. Balance of Harms and the Public Interest

The court must balance the harm to Plaintiffs of not granting the injunction against the State's harm if the injunction is granted. *See Fish*, 840 F.3d at 755-56. And where, as here, the government is the opposing party, the balance-of-harms factor merges with the fourth preliminary-injunction factor, which requires that the injunction not be adverse to the public interest. *See Nken*, 556 U.S. at 435.

Plaintiffs have made a strong showing that these factors favor granting an injunction. Any unconstitutional infringement of Plaintiffs' free exercise right is significant, and outweighs any marginal impact on the State's ability to fight the pandemic. Plaintiffs' relatively small congregations will now be governed by the same rules as other, non-religious institutions such as schools, warehouses, distribution centers, and grocery stores. To be sure, and as the court has already recognized, the threat of communicable disease is serious, and the State has a compelling interest in retarding its spread. To the extent this order hinders that effort, that is a potential harm to the public interest and is not to be taken lightly.

But fighting COVID-19 is not the sum total of the "public interest," as the State itself has recognized. The State's decision to exempt certain secular activities from certain of the restrictions imposed in its public-health orders reflects its judgment that some level of risk of transmission is justified for dining out, schools, critical retailers, and the like. Neither the State nor the court is empowered to declare that those risks are worth taking while the risks associated with Plaintiffs' free religious exercise are not. Viewed this way, the harm to the public interest by granting an injunction is narrow—all the injunction will do is bring the State's chosen balance between combatting the virus and allowing some semblance of communal life to continue inline as to secular and religious institutions. If the public interest is served by allowing diners to unmask while eating in a restaurant, it is similarly served by allowing Plaintiffs to do the same in church. The public has an interest in preserving constitutional rights. *Hobby Lobby*, 723 F.3d at 1145.

## CONCLUSION

It is ORDERED that Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction [Doc. 13] is GRANTED IN PART.

It is FURTHER ORDERED that, pursuant to Federal Rule of Civil Procedure 65(a), the State Defendants, their officers, agents, servants, employees, and attorneys, and any other persons who are in active concert or participation with them are preliminarily enjoined from enforcing against Plaintiffs Denver Bible Church, Robert A. Enyart, Community Baptist Church, and Joey Rhoads:

(1) the indoor occupancy limitations set forth in Sections II(B)(2)(j), II(C)(2)(j), and II(D)(2)(j) of Public Health Order 20-35, as amended and extended; and

(2) the face-covering requirement set forth in Executive Order D 2020 138, as amended and extended, and in Sections I(B), III(C)(1), III(C)(4)(g), and III(C)(5)(c), of Public Health Order 20-35, as amended and extended, where the temporary removal of a face covering is necessary for Plaintiffs or their employees, volunteers, or congregants to carry out their religious exercise.

DATED: October 15, 2020          BY THE COURT:

_____

Hon. Daniel D. Domenico